SERVICEMASTER OF ST. CLOUD, Respondent,

v.

GAB BUSINESS SERVICES, INC., Respondent,

Sentry Insurance, a Mutual Company, Appellant.

No. C9–94–1335.

Supreme Court of Minnesota.

March 8, 1996.

Joseph F. Lulic, Timothy L. Blakely, Minneapolis, for appellant.

Roger C. Justin, St. Cloud, for Respondent ServiceMaster.

Carol A. Kublic, Edina, for Respondent GAB Business Services.

William M. Hart, R.D. Blanchard, Minneapolis, amicus curiae, for Ins. Fed. of Minn.

## OPINION

STRINGER, Justice.

This appeal arises out of a claim by respondent ServiceMaster of St. Cloud, Inc. (ServiceMaster) that appellant Sentry Insurance, a Mutual Company (Sentry) should have paid for repair work that ServiceMaster completed in 1990 and 1991 on the fire damaged home of Sentry's insured, Nancy Mollinedo. The court of appeals affirmed both the Stearns County trial court's award of damages to ServiceMaster based on equitable claims of unjust enrichment and estoppel and the jury verdict in favor of ServiceMaster on its negligence claim. Because we conclude that ServiceMaster had an adequate remedy at law and that Sentry had no duty to ServiceMaster, we reverse.

On November 15, 1990, Nancy Mollinedo's Milaca home was damaged by fire. At the time of the fire, the house was insured by a policy issued by Sentry. The United States Farmers Home Administration (FHA) held a mortgage on the house and was therefore named in the Sentry policy as an additional insured. Pursuant to the insurance policy [1] and in accordance with Minn.Stat. § 65A.11, (1994) [2] the interests of the FHA were protected as the mortgagee.

Within 48 hours after the fire Mollinedo contacted Sentry to report the loss. Sentry claims representative George McCorkell in turn contacted respondent GAB Business Services, Inc. (GAB), an independent adjusting company. At GAB, adjuster Steve Kessler was assigned to investigate the Mollinedo claim and loss; Kessler's job was to determine the scope of damage and to contact contractors for repair estimates. It

---

1. The policy provided, in relevant part:

    If a mortgagee is named in your policy, any loss payment under the real property portion of the policy shall be paid to the mortgagee and you, as interests appear. If more than one mortgagee is named our payment will be in order of preference of the mortgages. If we deny your claim, that denial shall not apply to a valid claim, of the mortgagee * * *.

2. Minnesota Statutes section 65A.11 (1994) provides for payment to a mortgagee:

    When the whole, or any part, of the loss is payable, in terms or otherwise, to or for one or more mortgagees, upon proof before payment of the rights of the parties, the [insurance] company shall pay the same in the order of priority to the extent of its liability and every such payment to such extent shall be payment and satisfaction of its liability under the policy.

was then up to Mollinedo to hire a contractor of her own choosing. Kessler testified that his role in the process consisted of determining the amount of the loss and reporting back to Sentry and did not include hiring a contractor. Sentry's instructions to Kessler were to provide first, interim, and final reports of the adjustment investigation and included the instruction: "YOUR AUTHORITY IS: .00 (AUTHORITY IN EXCESS OF THIS AMOUNT MUST BE SECURED FROM THE ASSIGNING OFFICE.)."

On November 16, Kessler invited Roger Negaard, the president and owner of ServiceMaster, to submit an estimate for repairing the fire damage. Kessler and Negaard already had a professional relationship, and Kessler wanted to give Negaard a "lead" on the Mollinedo repair job. Negaard testified that within a couple of days, Negaard, Kessler, and Mollinedo met at the home for a walk-through to survey the damage. Kessler requested that Negaard put together an estimate as soon as possible.

ServiceMaster began working on the repairs on November 21, just five days after the initial contact. It is unclear who hired him; Negaard testified that he felt he received "the nod" to begin work from Kessler, but according to Kessler's testimony, under the normal practice, the homeowner would hire the contractor and, moreover, Mollinedo gave Negaard the key to the house. Negaard also spoke several times with Mollinedo about billing her for the repairs directly. On December 4—13 days after Negaard started work—Kessler told Negaard that there was a suspicion that Mollinedo had some part in starting the fire. Negaard testified that Kessler told him at that time that if Mollinedo started the fire, ServiceMaster "would get paid with the mortgage company rather than with [its] name on the check with the homeowner." Negaard testified he understood from the conversation that ServiceMaster would be protected whether it was determined that Mollinedo started the fire or not, but he admitted that Kessler never verbally promised him that ServiceMaster would get paid for the work.

Negaard continued the repair work on the Mollinedo home.

On December 6, Kessler submitted his first report to Sentry, and included in it a recommendation that Sentry issue a draft payable to Mollinedo, the FHA, and ServiceMaster. Kessler testified that he recommended that Sentry pay ServiceMaster in part to protect ServiceMaster, because he believed it had an interest in the property by virtue of Negaard's work. The standard industry practice as to payment to the contractor in this situation is in dispute: ServiceMaster argues that the practice in the industry is that an insurer includes the contractor's name on all settlement checks, while Sentry argues that is only done where the insurer pays the homeowner and does not apply to instances where only the mortgagee is paid. McCorkell testified that it is standard procedure to name the contractor on a check issued by an insurance company if the insured homeowner so desires. McCorkell also testified that it has never been Sentry's practice to name the contractor on a check where payment was only to the mortgagee and not to the insured. Stanton Stensrud, called as an expert witness on such matters, testified that he had never heard of an instance where the insurer would pay the mortgagee and not include the contractor on the draft.

During the time that ServiceMaster worked on the home, Negaard dealt with Sentry through Kessler, who continued to prepare reports for Sentry. In February, at Sentry's request, Kessler conducted a reinspection and reported to Sentry that there would be costs for supplemental repairs. Also during that time, Sentry hired an expert to investigate the cause and origin of the fire. Sentry never instructed Kessler to inform ServiceMaster that Sentry would probably deny Mollinedo's claim. Negaard completed the work on the house on March 22, 1991.

On March 26, Sentry officially notified Mollinedo that it would deny coverage to her under the insurance policy. Sentry issued a check payable only to the FHA on May 2, 1991, in the amount of $30,057.18, constituting the amount of ServiceMaster's bill for the repairs. ServiceMaster was not named as a

payee on the check. In exchange for the payment to the FHA, Sentry received a partial assignment of the mortgage equal to the $30,057.18 payment.

Mollinedo later sued Sentry for payment for the fire loss under her policy. A settlement agreement was reached which in part called for Sentry to assign to Mollinedo the partial assignment of the mortgage it had received from the FHA. On July 27, 1993, Mollinedo filed a Chapter 11 bankruptcy petition in United States Bankruptcy Court.[3] At some point ServiceMaster attempted to exercise its statutory mechanic's lien rights on the Mollinedo home, but was unable to do so, apparently because the pre-lien notices required under Minn.Stat. § 514.011 had not been filed within the requisite 10 day time period after the improvement work was agreed upon. Servicemaster never attempted to exercise its right to assert its constitutional mechanic's lien discussed hereafter, and it now remains unpaid for its services valued at approximately $30,000.

ServiceMaster brought suit against Sentry and GAB alleging breach of contract and unjust enrichment. Sentry filed a crossclaim against GAB for indemnity and attorney fees alleging that GAB acted without authority, and GAB cross-claimed against Sentry alleging that any damages suffered by ServiceMaster were due to Sentry's negligence or other wrongful conduct. The trial court granted ServiceMaster's motion to amend its complaint to add a claim based on estoppel and, during the trial, ServiceMaster also added a negligence claim. The trial began on January 4, 1994, and the jury returned a verdict on January 7, finding Sentry negligent in failing to name ServiceMaster on its check to the FHA, and ServiceMaster negligent in failing to request that its name be included on the check. The jury also found that of the negligence that caused ServiceMaster's damages, Sentry was responsible for 75% and ServiceMaster was responsible for 25%. It further found that there was no contract between Kessler and ServiceMaster. The trial court determined that ServiceMaster was entitled to relief on its

equitable claims and ordered Sentry to pay damages in the amount of $33,952.68. After the trial, Sentry moved for an order granting it indemnity against GAB and moved for JNOV or a new trial on grounds that the evidence did not support the jury verdict and that Sentry was denied a jury trial on the equitable claims. The trial court ruled against Sentry on all motions and Sentry appealed. The court of appeals affirmed on all claims.

■ First, as to ServiceMaster's claims for equitable remedies under theories of estoppel and unjust enrichment, we must determine whether there was an adequate remedy at law that would bar relief in equity. A party may not have equitable relief where there is an adequate remedy at law available. *See United States Fire Ins. Co. v. Minnesota State Zoological Bd.,* 307 N.W.2d 490, 497 (Minn.1981). The trial court's conclusion that ServiceMaster did not have an adequate remedy at law is a legal determination and is subject to de novo review by this court. *See Frost–Benco Elec. Ass'n v. Minnesota Pub. Utils. Comm'n,* 358 N.W.2d 639, 642 (Minn. 1984).

Sentry argues that ServiceMaster's right to pursue its remedy through a mechanic's lien was an adequate remedy at law that ServiceMaster opted not to pursue. ServiceMaster argues, and the trial court agreed, that the availability of a mechanic's lien did not bar equitable relief because Sentry had induced Negaard not to file a pre-lien notice required by Minn.Stat. § 514.011 (1994) which would have preserved ServiceMaster's mechanic's lien remedies. The trial court found that Sentry implied by its conduct that it would either pay ServiceMaster directly for its work or ensure ServiceMaster's payment by naming ServiceMaster on the structure damage settlement check. The trial court concluded further that ServiceMaster reasonably relied on Sentry's conduct to its detriment, and that it could have immediately ceased work and protected its lien interests had it known that Sentry would not make payment.

---

**3.** Although it is not part of the record, ServiceMaster included in the appendix to its brief a

copy of Mollinedo's bankruptcy discharge, dated November 2, 1993.

Section 514.011 requires that pre-lien notice be given to a homeowner within 10 days after the work of improvement is agreed upon if there is no written contract. Here, the improvement work was agreed upon, at the very latest, by November 21— the day ServiceMaster began working. ServiceMaster then had until December 3 to give the statutorily required pre-lien notice and failed to do so. The conversation that transpired between Negaard and Kessler, upon which the trial court based its conclusion that ServiceMaster relied on Kessler's representations, did not occur until December 4, one day *after* the pre-lien notice period had expired. Thus, there could not have been reliance on statements by Kessler that would have induced ServiceMaster to forego its statutory mechanic's lien rights. The mechanic's lien statute provides contractors with a sure remedy for getting paid but it requires compliance with strict time restrictions on the part of the contractor to protect its rights. Should a contractor elect not to seek the protection of the clear and effective method available under the statute, this court will not come to its aid, absent compelling circumstances not present here.

Further, ServiceMaster had a constitutional lien available to it even after the pre-lien notice period under section 514.011 had expired. The constitutional lien is provided for in Article I, section 12 of the Minnesota Constitution:

> A reasonable amount of property shall be exempt from seizure or sale for the payment of any debt or liability. * * * Provided, however, that all property so exempted shall be liable to seizure and sale for any debts incurred to any person for work done or materials furnished in the construction, repair or improvement of the same, and provided further, that such liability to seizure and sale shall also extend to all real property for any debt to any laborer or servant for labor or service performed.

ServiceMaster could have proceeded under this constitutional provision by obtaining and docketing a judgment against Mollinedo, "the lien then becoming effective through the judgment obtained immediately upon the docketing thereof." *Wallace T. Bruce, Inc. v. Najarian,* 249 Minn. 99, 113, 81 N.W.2d 282, 292 (1957). This type of lien becomes effective against otherwise exempt property as long as the lien is perfected before the debtor receives a discharge in bankruptcy. *Id.* at 110, 81 N.W.2d at 294.

Here, ServiceMaster completed its repair work on March 22, 1991, Sentry issued a check to the FHA on May 2, 1991, and Mollinedo filed a bankruptcy petition on July 27, 1993. Thus, ServiceMaster had at least two years after Sentry failed to name it on the FHA check to obtain a judgment against Mollinedo and thereby perfect its constitutional lien. We conclude that both the statutory and the constitutional lien rights were adequate remedies that would bar ServiceMaster's claims for equitable relief, and therefore reverse the trial court's award on this claim.

As to the unjust enrichment allegation, the trial court awarded ServiceMaster the value of the improvements it provided to Mollinedo's home, finding that when Sentry accepted the security interest in the home, it understood that the value of that interest was significantly increased because of ServiceMaster's work. To establish an unjust enrichment claim, the claimant must show that the defendant has knowingly received or obtained something of value for which the defendant "in equity and good conscience" should pay. *Klass v. Twin City Fed. Sav. and Loan Ass'n,* 291 Minn. 68, 71, 190 N.W.2d 493, 494–95 (1971). "[U]njust enrichment claims do not lie simply because one party benefits from the efforts or obligations of others, but instead it must be shown that a party was unjustly enriched in the sense that the term 'unjustly' could mean illegally or unlawfully." *First Nat'l Bank v. Ramier,* 311 N.W.2d 502 (Minn.1981). Here, however, Sentry did not receive a security interest in Mollinedo's home under any cloud of impropriety; nor did what Sentry receive even constitute "enrichment," as Sentry paid dollar-for-dollar for what it got. In compliance with both its insurance contract and Minn.Stat. § 65A.11, Sentry paid the mortgagee and received in return a partial mortgage interest, the value of which was defined

by the amount of Sentry's payment. If Sentry must now pay damages to ServiceMaster in the amount of the repairs, it will have paid not just once, but twice. We therefore believe that the trial court's award was not supported by evidence of unjust enrichment.

■ Next we turn to ServiceMaster's claim that Sentry was negligent in failing to include its name on the check. Here Sentry argues that the trial court erred in submitting the issue to the jury because Sentry had no legal duty to ServiceMaster to do so. Existence of a legal duty is generally an issue of law for the court to decide, and we therefore address the issue de novo. *Larson v. Larson*, 373 N.W.2d 287, 289 (Minn.1985). In this context, we must look to a contractual relationship, to an applicable statute, the common law, or the conduct of parties for the requisite duty, but we find none. The jury found that there was no contract between Sentry and Kessler. As to the insurance policy, Sentry had a duty only to the insured and to the mortgagee. The policy states that the insurer will settle the loss with the insured "and anyone else having an interest in the property." ServiceMaster did not have any interest in the property at the time of the loss and was clearly not a third-party beneficiary under the policy; so therefore there was no duty based upon contract.

Nor do we find a statutorily imposed duty. Minnesota Statutes section 65A.11 imposes a duty on Sentry to pay the mortgagee, the FHA, but it does not create a duty on the part of Sentry to protect ServiceMaster by naming it as a payee on its check. To the contrary, it is at least arguable that under these circumstances, the settlement draft may be made payable only to the mortgagee.

The remaining basis for a duty alleged is one arising as a matter of law from the conduct of the parties, i.e., an assumed duty. The trial court found such a duty based upon its conclusion that "Sentry's agent,[4] Steven Kessler, represented to Roger Negaard that Mollinedo's claim would be denied only if she were proven to have committed arson." We believe that the evidence simply does not support a finding of a promise that could create such a duty, however. Negaard testified that he did not know or care who was going to pay him, but simply that he expected to be paid by someone. He also acknowledged that Kessler never made a promise as to payment, but that he felt confident, because of his relationship with Kessler, that he would be paid. Negaard billed Mollinedo directly for the work, implying that he was not operating under a promise from Kessler.

The trial court reviewed McCorkell's testimony regarding the standard procedure of including a contractor's name on a check for insurance proceeds and reasoned that Minn. Stat. § 65A.11 should be interpreted "in light of the custom and practices of Sentry in recognizing a third party's interest in insurance proceeds. Sentry had a duty to name ServiceMaster on the check to the FHA." Sentry argues that in reaching this conclusion, the court erroneously applied industry custom and practice to its analysis of whether Sentry had a duty, and that the expert testimony relating to custom and practice by Sentry and within the insurance industry generally might have been relevant to the standard of care, but not to the existence of a duty. We agree. A defendant will not be bound to conform its conduct to a standard of care unless a legally recognized duty exists. *Rasmussen v. Prudential Ins. Co.*, 277 Minn. 266, 268–69, 152 N.W.2d 359, 362 (1967). In *Gabrielson v. Warnemunde*, we reversed a court of appeals ruling that expert testimony as to industry custom established a legal duty. *Gabrielson v. Warnemunde*, 443 N.W.2d 540, 545 (Minn.1989). We held that the testimony by an experienced insurance agent as to necessary skill and care in renewing an insurance policy, "while important in establishing a standard of care, does not by itself establish a legal duty to exercise that care for the benefit of the insured." *Id.* Our analysis here is similar: the evidence of industry custom would be relevant as to a standard of care, but did not establish a duty on the part of Sentry to ServiceMaster.

4. The trial court's reference to Kessler as Sentry's agent is unsupported by any finding of either the jury or the court as to agency.

We conclude that the trial court erred in submitting plaintiff's negligence claim to the jury because ServiceMaster failed to establish that Sentry owed it a duty to name ServiceMaster as a payee on the check for the fire loss.

Reversed.

COYNE, J., not participating.