ANALYSIS
I
We first clarify what this appeal is not about. It is not about whether the district court correctly decided that ERISA does not preempt O'Brien & Wolf's attorney-lien petition. "Well established in this state's jurisprudence is the precept that the court will decide only actual controversies." In re Schmidt , 443 N.W.2d 824, 826 (Minn. 1989). If we cannot grant relief on an issue purportedly raised on appeal, the issue is moot, and we will neither decide the issue ostensibly to establish precedent nor release an advisory opinion. Id. Although O'Brien & Wolf's first proffered legal issue on appeal is whether the district court erred in the way it concluded that ERISA does not preempt O'Brien & Wolf's attorney-lien petition, and the parties' briefs quarrel over the soundness of the district court's reasoning , neither O'Brien & Wolf nor the Plan have appealed the district court's conclusion that ERISA does not preempt the petition. For the purposes of this appeal, we therefore accept the district court's uncontested conclusion that ERISA does not preempt the petition, and we offer no opinion about its reasoning.
II
We address only O'Brien & Wolf's second contention on appeal, which is that the district court erred by finding no implied-in-law contract between O'Brien & Wolf and the ERISA Plan. If we hold that an implied-in-law contract exists, we must reverse the district court's decision that the Plan need not pay O'Brien & Wolf's contingency fee on the portion of Schurhammer's settlement recovery that Schurhammer was obligated to reimburse the Plan.
Courts have long called certain equitable obligations "contracts implied in law, or quasi or constructive contracts," even though "[i]n fact they are not contracts at all" since they are not founded on any agreement between parties. Fargo Foundry Co. v. Village of Calloway , 148 Minn. 273, 181 N.W. 584, 584 (1921). Courts began labeling these equitable obligations "contracts" only to allow for compensation under the prevailing formalistic rules of enforceability and remedy. See id. ("The use of the term 'contract' rests solely on a legal fiction."). These obligations rest on notions of justice and fairness rather than on any actual agreement between parties, "[s]o where one has money or property belonging in equity and good conscience to another, the latter is entitled to it, and, if need be, the law will assist him in getting it." Town of Balkan v. Village of Buhl , 158 Minn. 271, 197 N.W. 266, 267 (1924) ; see also Acton Constr. Co. v. State , 383 N.W.2d 416, 417 (Minn. App. 1986), *317 review denied (Minn. May 22, 1986) (providing the "essential elements of quasi contract" to include a benefit conferred to a party who retains it "under such circumstances that it would be inequitable for him to retain it without paying the value thereof") (quotations omitted). In other words, the term "contract implied in law" is not really a contract, but a noncontracted obligation, and it does not really arise from law, but from equity. We must therefore decide whether justice and fairness obligate the Plan to pay O'Brien & Wolf for services the firm rendered on behalf of its injured client, a portion of whose settlement funds was applied to reimburse the Plan for the healthcare payments the Plan made on his behalf. More fundamentally, we must decide whether this is a case in which part of the reimbursement to the Plan is money or property that belongs in equity and good conscience to O'Brien & Wolf in the form of attorney fees.
Johnson Analysis
The parties discuss at length a key supreme court opinion in the development of the contract-implied-in-law doctrine, Johnson v. Blue Cross and Blue Shield of Minnesota , 329 N.W.2d 49 (Minn. 1983), which applies the doctrine in circumstances loosely resembling our case. We believe that the Johnson court's analysis implies factors that we should apply to O'Brien & Wolf's claim for attorney fees based on an alleged contract implied in law.
The Johnson case involved an attorney who had successfully represented an employee in a worker's compensation proceeding that resulted in benefits awarded to the employee and also in reimbursement automatically awarded to the employee's health insurer for medical costs that the insurer had paid on the employee's behalf. 329 N.W.2d at 51. The attorney sued the health insurer to require it to pay attorney fees from its reimbursement award. Id. The supreme court recognized that no actual contract bound the insurer to pay the attorney fees, which is akin to our facts here, and it then analyzed the attorney-fee claim under the contract-implied-in-law doctrine. Id. at 52-53.
The Johnson court rejected the attorney's claim that the insurer was bound to pay the fees under the doctrine. Id. The court reasoned that, although the insurer benefited indirectly from the attorney's services, it was not unjust for the insurer to receive its full reimbursement without paying any attorney fees to cover the benefit. Id. at 51-53. O'Brien & Wolf correctly points out that this case does not precisely replicate Johnson , as the attorney fees in that case resulted from the attorney's securing benefits for his client in the unique environment of a worker's compensation proceeding, and here the attorney fees resulted from the securing of a settlement in contemplation of a civil action. But the Johnson court's careful reasoning informs our understanding of how to approach O'Brien & Wolf's claim of contract implied in law.
The Johnson court mentioned four factors while concluding that the circumstances in the worker's compensation setting did not establish a contract implied in law between the reimbursed insurer and the attorney who represented the insured. The court emphasized first that the worker's compensation scheme put the financial burden of a loss in a work-related-injury case on the employer rather than on the healthcare insurer. Id. at 52. It emphasized second that the attorney did no more work on behalf of the represented employee than he would have done for him anyway. Id. It emphasized third that the worker's compensation statute obligates the healthcare insurer to cover the insured's *318 healthcare costs pending the resolution of liability for the underlying injury. See id. at 51-52. And it emphasized fourth that the worker's compensation scheme puts the healthcare insurer in a passive beneficiary position, entitling it to be automatically reimbursed as a remedy in the worker's compensation process after merely intervening and filing an affidavit of its costs. Id. This four-factor reasoning illuminates our analysis of whether the district court rightly concluded that O'Brien & Wolf is not entitled to collect attorney fees from the Plan's reimbursement under a theory of contract implied in law.
Both parties urge our de novo review of the district court's interpretation and treatment of Johnson . We agree that this is our standard of review, as the standard mirrors our partly de novo approach in a different case that involved the related equitable concept of unjust enrichment. In that case we said, "A determination of unjust enrichment is unwarranted where findings of fact, corrected for clear errors, do not show that a party wrongfully benefited at the expense of another." Custom Design Studio, a Div. of L.B. Baron Props., Inc. v. Chloe, Inc. , 584 N.W.2d 430, 431 (Minn. App. 1998), review denied (Minn. Nov. 24, 1998). The same applies in promissory estoppel cases, where, if the facts are not in dispute, we will review whether the facts "rise to the level of promissory estoppel" as a question of law. Martens v. Minn. Min. & Mfg. Co. , 616 N.W.2d 732, 746 (Minn. 2000). Here the facts are not in material dispute. Although O'Brien & Wolf does state that it "is clear error" to conclude that the firm did not promise to protect the Plan's interest "given the facts," we reject the Plan's attempt to convert the statement into a factual issue about which the district court's conclusion in the Plan's favor is entitled to deference. In context, the firm's ambiguous statement appears to argue only that this court would engage in a clear legal error if, on our facts, we hold that a promise to pay did not occur. We therefore consider de novo the question of whether the parties' circumstances establish a contract implied in law. For the following reasons, our de novo review in applying the four Johnson factors and considering additional circumstances leads us to the same ultimate conclusion the district court reached, albeit on a somewhat different rationale.
The first factor relied on by the Johnson court-that the statutory scheme in the underlying proceeding put the ultimate burden of the employee's loss on his employer rather than on the healthcare insurer-finds a loose parallel here. Here the underlying common-law claim of negligence put the ultimate burden of Schurhammer's loss on the tortfeasor who caused his injury, not on a third party, like an insurer or an ERISA health plan. See Sutherland v. Barton , 570 N.W.2d 1, 5 (Minn. 1997) (stating that an individual is directly liable for breaching a duty to another through his own negligent act). This factor favors affirming the district court's decision not to find a contract implied in law.
The second factor considered in Johnson -that the attorney did no more work on behalf of the insured employee than he would have done for him anyway-also draws a parallel here. Here O'Brien & Wolf's effort to recover the reimbursement amount on Schurhammer's behalf involved no additional work beyond what the firm had to expend to obtain the recovery as a whole. This factor similarly favors affirming the district court.
The third factor relied on by the Johnson court-that the underlying statute obligated the healthcare insurer to cover *319 the insured's healthcare costs pending the resolution of liability-also draws a parallel here. Here the terms creating the Plan obligated it to cover Schurhammer's medical costs pending the resolution of the tortfeasors' liability. In particular, the Plan's Summary Plan Description requires the Plan to make the covered payment of a medical loss "as soon as the Plan Administrator receives written proof" of the loss. As the insurer in Johnson was statutorily required to pay first and possibly be reimbursed later, so too the Plan here had a contractual duty to front Schurhammer's medical costs with only the possibility of being reimbursed later. This factor also favors affirming the district court's decision not to find a contract implied in law.
But the fourth factor-that the legal process automatically entitles the insured to reimbursement after merely passively intervening in the underlying proceeding-leans the other way. While the Johnson court observed that the relevant statutes left the healthcare insurer in a passive position in the worker's compensation proceeding (a proceeding in which the administrative judge was required by law to automatically award reimbursement of medical costs directly to the insurer if the employee prevailed in his worker's compensation claim) the procedural scheme here would not result in any automatic reimbursement to the Plan. The settlement negotiation that generated the recovery did not involve the Plan directly, and had the Schurhammer tort action gone to trial, the Plan would have had to take an intervening role to enforce its reimbursement rights or sit out the trial and later pursue its right to reimbursement against Schurhammer directly. Unlike the statutes controlling the worker's compensation dispute in Johnson , the civil rules regulating ordinary tort litigation do not afford a third-party healthcare-benefits provider an automatic reimbursement award on a plaintiff's victory against a tortfeasor. It is true that the Plan's terms established its right to be reimbursed the benefits it paid on Schurhammer's behalf and obligated Schurhammer to cooperate with the Plan's reimbursement effort. But nothing we have seen in the Plan's language or ERISA law would make reimbursement procedurally automatic, as it was in Johnson . If Schurhammer had refused to reimburse the Plan after recovering the funds, the Plan would have had to sue Schurhammer under federal law, which authorizes a health plan administrator to "obtain other appropriate equitable relief ... to enforce any provisions of ... the terms of the plan." 29 U.S.C. § 1132(a)(3)(B)(ii) (2012). And if Schurhammer had not initiated his tort claim, the Plan's terms would have required it to initiate a subrogation action to recover its payments: "The Plan will commence any action it deems appropriate against ... [a] Third-Party to protect its subrogation and reimbursement rights." The Plan is simply not in the same passive beneficiary position enjoyed by the Johnson insurer. This factor therefore favors reversing.
O'Brien & Wolf argues that the district court erred by even considering Johnson , contending that Johnson is a mere anomaly, "an exception to the general public policy in Minnesota imposing the cost of the benefit on the party who receives it." O'Brien & Wolf directs us to Mann v. Unity Medical Center , 442 N.W.2d 291 (Minn. 1989), which supposedly better represents how the supreme court "embraced [the] public policy" in that it "refuse[d] to follow Johnson ." O'Brien & Wolf's argument overlooks a critical distinction between Johnson and Mann . Unlike the Johnson court's review of whether the right to fees arose under the equitable theory of contract implied in law, the Mann court addressed whether the right *320 to fees arose under specific worker's' compensation statutes. See Mann , 442 N.W.2d at 292-93 ("Unlike Johnson , ... attorney fees in this case are recoverable under [a specific workers' compensation statute] which imposes a lien against reimbursements to those entities that ... have essentially 'prepaid' that portion of workers' compensation benefits awarded to the employee."). O'Brien & Wolf's argument under Mann also ignores the fact that, the same day the supreme court decided Mann , it decided Barnick v. Swift Eckrich, Inc. , 442 N.W.2d 294 (Minn. 1989), and the Barnick court fully embraced Johnson 's rationale and concluded that " Johnson ... applies to reimbursements to health carriers." Barnick , 442 N.W.2d at 295. The Barnick court, like the Johnson court, refused to allow an award of attorney fees to be deducted from healthcare benefits reimbursed to the insurer, id. , and nothing in the Barnick court's reasoning calls into question Johnson 's approach to contracts implied in law. Neither does Mann undermine Johnson 's decision or rationale.
Although Johnson involved a commercial health insurer rather than a self-funded ERISA health plan, and it involved an award in a worker's compensation proceeding rather than a recovery settling a civil tort claim, we believe Johnson provides a useful framework for deciding the contract-implied-in-law claim in this case. And we conclude that the Johnson factors slightly favor affirming the district court's holding that no contract implied in law existed based on the relationship between O'Brien & Wolf and the Plan. Even on those factors alone, it would be difficult to say that the Plan's reimbursement constitutes "money or property belonging in equity and good conscience to" the law firm. Balkan , 197 N.W. at 267. But additional circumstances that we now address strengthen our decision.
Other Circumstances Bearing on Equity
This would be a close case if the circumstances implicated only the Johnson factors, which we believe tip somewhat in favor of concluding that the Plan is not obligated to pay a share of O'Brien & Wolf's attorney fees as a matter of fairness and justice. But other circumstances clearly defeat the law firm's equity-framed assertion that it was always acting so as "to protect the Plan's interest." We first consider the Plan's emphasis that "O'Brien did not invite the Plan or its counsel to participate in [the] settlement negotiations." We next consider the Plan's highlighting that it notified O'Brien & Wolf that it would not be obligated to pay attorney fees for services not preapproved. Then we consider the law firm's choice to redirect part of the contingency-fee obligation away from Schurhammer and onto the Plan. Finally, we discuss the manner in which it attempted to charge the Plan at a higher rate than it charged Schurhammer. The first of these circumstances does not influence our holding, but the other three do.
A. The Firm's Decision Not to Include the Plan in Settlement Discussions
The law firm's decision not to invite the Plan into the settlement discussions does not bear on the equities. O'Brien & Wolf's failure to invite the Plan to participate in the settlement discussions between Schurhammer and the snowmobiling tortfeasors could not have prejudiced the Plan's interest in its reimbursement. Even without the Plan's participation in the settlement discussion, Schurhammer's less-than-full recovery of $800,000 was large enough to allow him to fully reimburse the Plan the $152,739 it had paid to cover his healthcare costs. We do not see how the Plan could have fared any better *321 by directly participating in discussions, even if its participation resulted in Schurhammer receiving full recovery of all his claimed damages. In that scenario, the Plan would have received the same, full reimbursement, and it would still have faced O'Brien & Wolf's asserted right to a share of the reimbursement as attorney fees under its contract-implied-in-law theory. O'Brien & Wolf's decision not to involve the Plan's attorney in settlement negotiations does not weigh on our analysis of the equities.
B. The Firm's Decision Not to Seek Prior Approval of Services and Fees
That neither O'Brien & Wolf nor Schurhammer sought the Plan's prior approval for the law firm's services after the Plan warned that it would not pay unapproved attorney fees does, however, bear on our analysis. By failing to respond to the Plan's requirement to obtain prior approval for services, O'Brien & Wolf prevented the Plan from negotiating an agreeable attorney fee. This is significant in a case like this where tortfeasor liability and damages may have been so certain that the Plan could have predicted an early settlement with little need for substantial attorney services. Indeed, in retrospect, O'Brien & Wolf's attorney logged only about 80 hours on the case from retention to settlement, and much of that time was spent researching subrogation. Cf. Waller v. Hormel Foods Corp ., 120 F.3d 138, 142 (8th Cir. 1997) (observing that "a contingent fee award would not be appropriate absent evidence that the Plan would have hired counsel on this basis"). The firm's failure to approach the Plan on Schurhammer's behalf to obtain approval deprived the Plan of the opportunity to negotiate either for a lower contingency fee or for an hourly fee structure consistent with the minimal work the case would likely involve. And so depriving the Plan after the Plan announced that it would not pay fees without an agreement is not consistent with claiming that the Plan acted unfairly by refusing to pay the after-the-fact demand for a one-third cut of the $152,739 reimbursement.
We are not suggesting that the Plan's initial statement to O'Brien & Wolf that it would not pay unapproved attorney fees would, by itself, defeat the firm's contract-implied-in-law argument. To the contrary, an early attorney-fees case applying the doctrine informs us that merely making an I'm-not-paying-you statement beforehand does not necessarily defeat a contract-implied-in-law recovery of attorney fees. In that case, a family physician and the children of a sane woman who had previously been adjudicated insane incurred attorney fees in litigation to relieve her of the insanity judgment. Carr v. Anderson , 154 Minn. 162, 191 N.W. 407, 407 (1923). The supreme court held that the doctrine of contracts implied in law required, as a matter of justice, that her husband (who bore the legal duty to provide for his wife's "necessaries") pay his wife's attorney fees even though the husband had opposed both the lawyer's involvement and the litigation, and even though he had declared in advance that he would not pay the attorney fees. Id. But this case does not resemble Carr , where the husband was bound by law to fund his wife's needs, including securing the judgment of sanity the attorney obtained on the wife's behalf.
O'Brien & Wolf contends that a different case involving no prior agreement between a third party and an attorney requires the Plan to pay its contingency fee on the $152,739 reimbursement, pointing to Keene v. Stattman , 256 N.W.2d 295 (Minn. 1977). The contention is not convincing. In Keene , a hospital provided medical care to an injured man whom it knew had no money, *322 no steady job, and no insurance to cover the cost of his care. 256 N.W.2d at 296. After the injured man's attorney commenced an action against the third party responsible for his injuries, the attorney spoke with the hospital's business office many times, assuring the hospital "that he would protect [its] bills in the event that the plaintiff was successful in his lawsuit" even though the hospital never expressly contracted for the attorney's services. Id. The supreme court implicitly concluded that the lawyer's promises to the hospital constituted an enforceable attorney-client agreement implied in fact, holding that the attorney had an enforceable attorney lien on the settlement funds under Minnesota Statutes, section 481.13. See id. at 298 ; see also Johnson , 329 N.W.2d at 53 (observing that section 481.13"only imposes a lien to protect the attorney who already has [an agreement to pay attorney fees] whether the agreement therefor be express or implied" and observing, "In Keene ... the attorney had promised the hospital to protect its interests if his client was successful") (quotation omitted). Unlike the hospital in Keene , the Plan here did not reach any express or implied agreement to pay the law firm's fee or tacitly consent to its representation; again, the Plan instead expressly declared that it would represent itself and not pay any attorney fees without prior agreement. O'Brien & Wolf's choice not to respond to the Plan's requirement to seek approval for services is not akin to the Keene attorney's behavior, and Keene does not lead us to see a contract implied in law in this case.
C. Firm's Choice Not to Protect Its Contingency-Fee Interest
Also significant to our fairness assessment is O'Brien & Wolf's decision to try to reallocate the duty to pay part of its fee from Schurhammer, who had contracted for the firm's services, to the Plan, which had not. This reallocation attempt conflicts with the notion that the firm was looking out for the Plan's interests in a manner that compels an equitable remedy.
The district court described the reallocation attempt. It said that "[i]t was Schurhammer's contractual obligation to repay [O'Brien & Wolf]" and that O'Brien & Wolf "agreed to recover only the net settlement from Schurhammer rather than the gross." The record reveals a sequence of events that amply supports the district court's description. First, Schurhammer's contingency-fee agreement entitled the firm to receive "as compensation for services, one-third ... of any sum obtained or recovered for [Schurhammer] in the settlement ... of [his] claim." (Emphasis added.) Then O'Brien & Wolf received the Plan's letter accurately informing the firm that "Mr. Schurhammer is obliged to fully reimburse the Plan out of any recovery he receives, regardless of how that recovery is characterized." Later the firm began extensively conducting "legal research concerning priorities" and "[l]egal research concerning ERISA subrogation claims." During this period, the firm asked the Plan to accept only 40% of the funds the Plan paid on Schurhammer's behalf. The firm next received the Plan's response that its trustees "unanimously rejected the offer" to accept less than full reimbursement. Soon, the O'Brien & Wolf attorney handling Schurhammer's settlement included a billing entry, "Memo to file re distribution formula, hold back on subrogation claims" the day before he drafted the settlement distribution sheet subtracting the Plan's reimbursement of $152,739 from Schurhammer's contingency-fee obligation. Finally, the attorney sent the Plan a letter demanding one-third of the reimbursement as a contingency fee, and then the reimbursement check with a notice of attorney lien. This chain of events supports the *323 district court's description of firm's after-the-fact decision to reduce the sum it recovered for Schurhammer, effectively shifting some of the contingency-fee obligation away from him and onto the Plan.
That the law firm altered its original fee arrangement from having Schurhammer pay a contingency fee on "any sum" recovered to his having to pay a contingency fee only on the sum recovered minus his obligation to the Plan is not by itself problematic. Of course we see nothing wrong with a reduction as a matter of ethics or goodwill. See In re Petitionfor Distribution of Attorney's Fees between Stowman Law Firm, P.A. , 870 N.W.2d 755, 759 (Minn. 2015) ("[A]n attorney's fee must be reasonable under the circumstances, even if contingent on the outcome." (citing Minn. R. Prof. Conduct 1.5(a), (c) ) ). But after the firm subtracted the obligation from Schurhammer, with whom it had a contractual relationship as a matter of law, it then attempted to reallocate the obligation to the Plan, with whom it sought only an equitable relationship. This creates two problems as it concerns the firm's claim for an equitable remedy.
First, by willfully removing the legal obligation from its contracted client, the firm has little force to insist that the court should then reassign the obligation to a different entity in the form of equitable relief. "A party may not have equitable relief where there is an adequate remedy at law available." ServiceMaster of St. Cloud v. GAB Bus. Servs., Inc. , 544 N.W.2d 302, 305 (Minn. 1996). O'Brien & Wolf had the opportunity to protect its right to a full contingency payment by drawing from the gross settlement recovery and leaving Schurhammer to meet his own reimbursement obligation to the Plan. Although the firm may have relinquished any contract claim against Schurhammer for the disputed fee through its settlement-distribution decision, meaning that the firm might no longer have an adequate remedy at law, its voluntary decision to relinquish its legal claim against Schurhammer is not a choice for which the Plan should, as a matter of equity, be required to pay. Second, the firm's decisions seem to reflect its favoring of one client (its contracted client) over another client (its supposed equitable client). We know of no case where a law firm's choice favoring a contracted client over a putative client in the allocation of fees creates an enforceable equitable obligation to be levied against the disfavored client.
D. Firm's Attempt to Bill the Plan at a Higher Contingency Rate
The final circumstance is related to the previous one. Our concern here rests on the manner in which the law firm attempted to charge the Plan a contingency fee at a greater rate than the fee it charged Schurhammer. In his letter asserting the firm's alleged entitlement to recover attorney fees from the Plan, the O'Brien & Wolf attorney wrote, "Our retainer agreement with Mr. Schurhammer provided for a standard one-third contingency fee and I am requesting that the Plan honor that same percentage agreement." What the letter failed to disclose is that, one month earlier during the distribution of the recovered funds, the attorney had reduced from one-third to one-fourth the fee the firm ultimately charged Schurhammer: "1/4 [reduced fee taken per Attorney Heuel]." We do not suggest that a law firm must charge all of its clients at the same rate, even on the same file. And we recognize that the letter mentions the "retainer agreement" rate, not the modified, actually-charged rate that Schurhammer paid; so the letter is not literally false. But it at least implies , inaccurately, that the firm expects the Plan to pay the "same *324 percentage" rate that it charged Schurhammer and that this rate is one-third the net recovery. This suggests that the firm attempted to exact a higher rate from the Plan than it charged Schurhammer while it suggested that the rates were the same. The incomplete nature of this communication, in context, does not position the firm well to claim an equitable right to a share of the Plan's reimbursement funds.
Full-Recovery Doctrine Inapplicable
Our analysis is not influenced by the full-recovery doctrine, which O'Brien & Wolf suggests should have some bearing on our decision. The doctrine was established as a matter of equity in Westendorf by Westendorf v. Stasson , 330 N.W.2d 699, 703 (Minn. 1983) (holding that equity requires subrogation only after the injured person's judgment is large enough to cover all his damages not paid by insurance proceeds under "the full recovery rule" unless the insurance agreement states clearly that the insurer "is to be reimbursed even if its member recovers less than full compensation"), and is now required as a matter of law by Minnesota Statutes, section 62A.095, subdivision 2(1) (2018). Whether the Plan had a right to full reimbursement is not presently in dispute, and so the full-recovery doctrine is not relevant to our decision.
Zero-Sum Game
Our decision about equity must rest on something other than the simple maxim that a party should never get something for nothing. Deciding what is "fair" and "just" is more complex in this circumstance where every party cannot be made whole. An injured person seeks to be made whole by a full recovery to compensate his injury. A contingency-fee based law firm seeks to be made whole by collecting every dollar of its contingency fee on all funds it recovered for the injured person. And a healthcare plan seeks to be made whole through reimbursement of every dollar it paid to healthcare providers on behalf of the injured person. While making each one of the participants whole is undeniably fair, arithmetic prevents all of them from being made whole at once. One or two participants in this zero-sum game must receive less than a full share. Our question then is not whether the economic result is unfair, but whether the party who obtained its full share while others did not obtain theirs, did so under circumstances that make it inequitable for the party to retain that share without paying one of the others.
DECISION
On balance, we hold that equity does not compel the ERISA Plan to pay the demanded contingency fee to the law firm. The Johnson factors somewhat favor this result and other circumstances add to it. We hold that the circumstances in which the Plan obtained the reimbursement do not make it inequitable for it to retain the reimbursement without paying O'Brien & Wolf for having secured it as part of Schurhammer's recovery. And we clarify that our opinion addresses only whether there is an implied-in-law contract for this ERISA plan under these circumstances, intending to suggest nothing about whether a Minnesota-regulated health insurer might have some legal or equitable obligation to contribute to attorney fees in similar circumstances.
Affirmed.