# United States Court of Appeals
### For the Eighth Circuit
_____

No. 23-3233
_____

Strategic Energy Concepts, LLC

*Plaintiff - Appellant*

v.

Otoka Energy, LLC; Buena Vista Biomass Development, LLC; Amador Biomass, LLC; Buena Vista Biomass Power, LLC; State Street Bank & Trust Company; Antrim Corporation

*Defendants - Appellees*
_____

Appeal from United States District Court
for the District of Minnesota
_____

Submitted: May 7, 2024
Filed: November 4, 2024
_____

Before COLLOTON, Chief Judge, SHEPHERD and STRAS, Circuit Judges.
_____

STRAS, Circuit Judge.

Strategic Energy Concepts, LLC, traded its shares in a power plant for a promise of payment if money became available. When it never came, Strategic sued

everyone else involved in the transaction. We affirm the district court's[1] decision to grant summary judgment to the defendants.

I.

Strategic teamed up with Otoka Energy, LLC, to develop a biomass power plant in California. The plant's assets went into a holding company, which the companies jointly owned. The plan was to sell power to the city of Sacramento.

The plant had problems from the start. It was "not operating," "had no revenue," and had generated $19 million in debt. Hoping to save the project, State Street Bank & Trust Company agreed to provide an infusion of capital. The deal had two parts. First, Strategic agreed to transfer its shares in the plant's holding company to Otoka for a conditional payment of $1.1 million

> [w]hen and to the extent proceeds from [State Street's investment] [were] available to [the old holding company] or Otoka and not otherwise required to be reserved or paid to parties other than [them] by the transaction documents entered into in connection with the [deal with State Street].

Second, State Street agreed to contribute $25 million to a new holding company. The $25 million went toward reducing the plant's debt, paying contractors, and bolstering capital reserves. State Street had the *option* to provide a $5 million installment payment if the plant became operational by a certain date, and then another $5 million if it was still running smoothly several months later.

The plant missed the first deadline because of "serious operational problems" that "had consumed all of the cash that had been reserved for operations and repairs."

---

[1]The Honorable Michael J. Davis, United States District Judge for the District of Minnesota.

It became operational three months later, but eventually shut down for good due to financial problems.

For its part, Strategic never received the $1.1 million payment. State Street's initial $25 million investment went elsewhere, and it did not make either installment payment.

After coming away with nothing, Strategic sued Otoka, State Street, and the old holding company, among others. It alleged various contract, tort, and fiduciary-duty claims. The district court dismissed some and dealt with the rest at summary judgment.

All that remained were some counterclaims against Strategic. While they were pending, Otoka settled a separate lawsuit with State Street over the installment payments. When Strategic learned about the settlement, it moved to reopen discovery in this case and for reconsideration of the summary-judgment order. The district court denied both requests, which prompted Otoka to voluntarily dismiss its counterclaims. Strategic now appeals the judgment dismissing its breach-of-contract, tortious-interference, and unjust-enrichment claims, as well as the denial of its motions for reconsideration and to reopen discovery.

II.

We review the grant of summary judgment de novo. *See Bharadwaj v. Mid Dakota Clinic*, 954 F.3d 1130, 1134 (8th Cir. 2020). Summary judgment is available when there is "no genuine issue of material fact" and "the evidence, viewed in a light most favorable to the nonmoving party, shows . . . the [party seeking it] is entitled to judgment as a matter of law." *Id.* (citation omitted). A factual dispute is "genuine" if "a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

A.

Much of the action at the district court revolved around Strategic's breach-of-contract claim.  The theory was that Otoka and the old holding company breached by failing to pay the $1.1 million when it became "available" after the initial infusion of capital from State Street.

The contract in question requires us to apply Minnesota law.  *See Milliken & Co. v. Eagle Packaging Co., Inc.*, 295 N.W.2d 377, 380 n.1 (Minn. 1980) (enforcing a choice-of-law provision).  No one disputes that the parties had an enforceable contract and that Strategic held up its end of the bargain by transferring its shares to Otoka.  *See Park Nicollet Clinic v. Hamann*, 808 N.W.2d 828, 833 (Minn. 2011) (laying out the elements of a breach-of-contract claim in Minnesota).  Rather, the disagreement is over whether Otoka and the old holding company breached by refusing to pay Strategic for its shares.  *See id.*

No payment was due immediately.  Instead, according to the parties' contract, two contingencies had to occur.  First, money had to become "available to [the old holding company] or Otoka," which arguably occurred when State Street provided the initial $25 million.  The second condition is what poses the problem for Strategic: the money couldn't be "otherwise . . . reserved or paid to parties other than [the old holding company] by the transaction documents entered into in connection with the" deal with State Street.

Three documents reveal why the second "condition precedent" was never satisfied.  *Nat'l Union Fire Ins. v. Schwing Am., Inc.*, 446 N.W.2d 410, 412 (Minn. Ct. App. 1989).  Start with the contract covering State Street's $25 million payment, which required the money to be spent "in accordance with [an] [i]nstruction [l]etter" sent to the escrow agent.  The second document, the instruction letter, directed the escrow agent to "[d]isburse the funds . . . in accordance with" an attached "final settlement statement."  And finally, the settlement statement showed that nearly the

-4-

entire $25 million was "reserved" for others: settling the $19 million debt, paying contractors, and bolstering the plant's capital reserves.[2]

Other documents tell the same story. One, a "flow of funds" memorandum, allocated almost all of the money to debt, contractors, and capital reserves. Another, a "Project Budget" that the parties attached to the contract covering the $25 million payment, said the same thing.

The bottom line is that every document in the record shows that the "event required by the condition [precedent] [did] not occur." *451 Corp. v. Pension Sys. for Policemen & Firemen of City of Detroit*, 310 N.W.2d 922, 924 (Minn. 1981). Strategic never "acquire[d] any [contractual] rights" to the money, and no reasonable juror could conclude otherwise. *Schwing*, 446 N.W.2d at 412.

## B.

Nor did State Street tortiously interfere with any of the contracts. Strategic believes it would have received the $1.1 million if State Street had not steered "at least $1.9 million" of its initial investment toward the plant's capital reserves and "refus[ed] to pay" the $5 million installment payments. To prevail, Strategic had to establish, among other elements, that State Street both "intentional[ly] procure[d] [a] breach" and did so without justification. *Sysdyne Corp. v. Rousslang*, 860 N.W.2d 347, 351 (Minn. 2015); *accord Lama Holding Co. v. Smith Barney Inc.*, 668 N.E.2d 1370, 1375 (N.Y. 1996).[3] There is no genuine issue of material fact on either point. *See Bharadwaj*, 954 F.3d at 1134 (citation omitted).

---

[2]Strategic argues that "the district court did not address" the approximately $40,000 in "remaining available cash." The company, however, never brought it to the court's attention. "As a general rule, we will not consider arguments raised for the first time on appeal." *Fleck v. Welch*, 937 F.3d 1112, 1116 (8th Cir. 2019).

[3]The relevant contracts have different choice-of-law provisions. Both Minnesota and New York law are possibilities, but it makes no difference which one applies. No "conflict exists between the laws of the two" states on any issue we

Start with breach. *See R.A., Inc. v. Anheuser-Busch, Inc.*, 556 N.W.2d 567, 570 (Minn. Ct. App. 1996); *Lama*, 668 N.E.2d at 1375 (explaining that the defendant must have induced a third party to commit an "*actual* breach of the contract" (emphasis added)). As we have already explained, the second condition precedent was never fulfilled, so neither the old holding company nor Otoka had any obligation to pay Strategic. State Street could not have induced a breach that never occurred.

Moreover, even if there had been a breach, State Street had justification for what it did. *See Sysdyne*, 860 N.W.2d at 351. The initial contribution to the plant's capital reserves was an effort to settle "a lot of account[s] payable[]" to keep the project moving. But once it became clear that the plant was no longer financially viable, State Street protected its own financial interests by holding on to its money rather than making two optional installment payments. *See Kjesbo v. Ricks*, 517 N.W.2d 585, 588 (Minn. 1994) (stating that a party's interference with a contract may be justified when it "asserts in good faith a legally protected interest of [its] own" (citation omitted)); *Foster v. Churchill*, 665 N.E.2d 153, 156 (N.Y. 1996) (explaining that interference with a contract can be justified by "economic interest" unless "there is a showing of malice or illegality").

It makes no difference that State Street debated internally whether to make the installment payments anyway. It still had the contractual right to refuse payment because the plant had not become operational by the first deadline and was well on its way to financial failure by the second one. State Street had no obligation to throw good money after bad just so Strategic could get paid. *See Kjesbo*, 517 N.W.2d at 588; *Foster*, 665 N.E.2d at 156.

---

face. *Nodak Mut. Ins. Co. v. Am. Fam. Mut. Ins. Co.*, 604 N.W.2d 91, 93–94 (Minn. 2000); *see Eggleton v. Plasser & Theurer Export Von Bahnbaumaschinen Gesellschaft, MBH*, 495 F.3d 582, 585 (8th Cir. 2007) (explaining that we "apply the choice-of-law rules of the forum state" (citation omitted)).

Cutting its losses and receiving $19.6 million in federal tax credits also did not unjustly enrich State Street. Strategic "received nothing" from the transaction, but it was not because of any "impropriety." *ServiceMaster of St. Cloud v. GAB Bus. Servs., Inc.*, 544 N.W.2d 302, 306 (Minn. 1996) (explaining that an unjust-enrichment claim requires that the defendant acted "illegally," "unlawfully," or "under [a] cloud of impropriety"); *see Paramount Film Distrib. Corp. v. State*, 285 N.E.2d 695, 698 (N.Y. 1972) (requiring "tortious or fraudulent" conduct).

Keep in mind what happened. Before giving up the shares, Strategic's CEO had access to the email conversations between Otoka and State Street as they finalized how to allocate the $25 million. Despite knowing in advance that the money would be spent elsewhere, Strategic still accepted a conditional buyout tied to the plant's success. It also knew, given the operational problems up to that point, that success was no guarantee. Perhaps Strategic "made a bad bargain" under the circumstances, but State Street "did no more than exercise [the] rights which were granted to [it] under the plain provisions of [a] written agreement." *Cady v. Bush*, 166 N.W.2d 358, 362 (Minn. 1969); *see Herlache v. Rucks*, 990 N.W.2d 443, 450 (Minn. 2023) ("Claims for unjust enrichment do not lie simply because one party benefits from the efforts or obligations of others." (citation omitted)); *Colum. Mem'l Hosp. v. Hinds*, 192 N.E.3d 1128, 1138 (N.Y. 2022) (explaining that it is not inequitable for a defendant to receive the benefit of its contract). "Equity and good conscience" required nothing more. *ServiceMaster*, 544 N.W.2d at 306 (citation omitted); *accord E.J. Brooks Co. v. Cambridge Sec. Seals*, 105 N.E.3d 301, 312 (N.Y. 2018).

III.

Only procedural loose ends remain. In Strategic's view, the district court should have granted its motion to reopen discovery after Otoka and State Street settled their claims against each other. It then could have sought reconsideration of

the summary-judgment order. The court said no to both, and we will reverse only if it abused its discretion. *See Sallis v. Univ. of Minn.*, 408 F.3d 470, 477 (8th Cir. 2005); *Schoffstall v. Henderson*, 223 F.3d 818, 827 (8th Cir. 2000).

There was no abuse of discretion because any motion for reconsideration would have been futile. Strategic's reason for reopening discovery was to explore the possibility that Otoka had received new money from the settlement with State Street. If it did, then Strategic could have shown that Otoka's failure to immediately turn over the newly "available" money breached their contract.

This newly-available-money theory does not work because the summary-judgment order was entered long before State Street and Otoka settled. "A Rule 60(b) motion . . . permits consideration only of facts which were *in existence at the time of*" the action being reconsidered. *Swope v. Siegel-Robert, Inc.*, 243 F.3d 486, 498 (8th Cir. 2001) (emphasis added); *see also Alicea v. Machete Music*, 744 F.3d 773, 782 (1st Cir. 2014) (denying a Rule 60(b) motion that was based on "new facts altogether, not new evidence of facts existing *at the time of summary judgment*" (citation omitted)). Strategic has never suggested that it could have discovered facts that "were in existence" at summary judgment, meaning it could not have prevailed in a Rule 60(b) motion.[4] *Swope*, 243 F.3d at 498. It had nothing to gain, in other words, from reopening discovery. *See Knapp v. Hanson*, 183 F.3d 786, 790 (8th Cir. 1999) (concluding that the district court does not abuse its discretion when it denies a motion that would be "futile"); *see also Hofer v. Mack Trucks, Inc.*, 981 F.2d 377, 380 (8th Cir. 1992) (noting that "information which does not reasonably bear upon the issues in the case" is generally outside the scope of discovery).

---

[4]Besides, even if it had the documents it seeks, Strategic would have needed to change its theory of recovery. It originally alleged that the breach occurred when State Street and Otoka failed to pay while the plant was open. If the money from the settlement—which came years later—is what it now seeks, a Rule 60(b) motion is not the vehicle for raising "an entirely new theory." *DeCastro v. Hot Springs Neurology Clinic, P.A.*, 107 F.4th 813, 817 (8th Cir. 2024).

IV.

We accordingly affirm the judgment of the district court.

COLLOTON, Chief Judge, concurring in part and dissenting in part.

I concur in rejecting most of the arguments raised by Strategic Energy Concepts, LLC, but would not affirm the judgment dismissing the claim for breach of contract. In concluding that the entire $25 million contribution from State Street Bank & Trust Company "was required to be reserved or paid to entities other than Strategic Energy," R. Doc. 200, at 21, the district court failed to acknowledge that approximately $40,000 of the contribution was "net cash remaining" according to the transaction documents. At a minimum, there is a genuine dispute of material fact about whether these remaining funds must be paid to Strategic Energy under the agreement. *See* R. Doc. 133-1, at 340. This error is plain on the face of the transaction documents—the project budget, flow-of-funds memorandum, and settlement statement—that featured prominently in the district court's decision. R. Doc. 133-1, at 426-27; R. Doc. 133-8, at 11, 25-27. Although Strategic Energy argued in the district court that there was a factual dispute about a larger amount of funds, there is no requirement that the plaintiff must enumerate each lesser included amount where the net cash remaining was clearly set forth in the documents cited by the parties and the district court. *See* R. Doc. 200, at 10-11, 20-21. The district court had ample notice of the net cash remaining, and the majority's conclusion that Strategic Energy waived any claim to these funds is unwarranted. Strategic Energy identified this error on appeal, Appellant's Br. 20, and the appellees' brief made no response. I would therefore reverse the judgment in part and remand for further proceedings.

_____