David and Gayle JOHNSON, as Trustees
for the heirs and next-of-kin of Melissa
Noelle Johnson, Respondents,

v.

STATE of Minnesota and its agents, Or-
ville Pung, et al., Hennepin County and
its officers, employees and agents,
Thomas Lamb, et al., 180 Degrees, Inc.,
Petitioners, Appellants.

No. C3–95–532.

Supreme Court of Minnesota.

Aug. 29, 1996.

Hubert H. Humphrey, III, Attorney General, James Alexander, Assistant Attorney General, St. Paul, for the State, et al.

Michael O. Freeman, Hennepin County Attorney, Toni A. Beitz, Sr. Assistant County Attorney, Minneapolis, for Hennepin County, et al.

Patrick D. Reilly, Deborah H. Mande, Minneapolis, for 180 Degrees, Inc.

Cosgrove, Flynn & Gaskins, Susan D. Hall, Scott M. Rusert, Minneapolis, for David Johnson, Gayle Johnson.

Bassford, Lockhart, Truesdell & Briggs, P.A., Frederick E. Finch, Mary L. Galvin, Minneapolis, for Amicus Curiae MN Community Corrections Association.

Kim Z. Mastro, St. Paul, for Amicus Curiae Association of MN Counties.

William J. Jeronimus, St. Paul, for Amicus Curiae MN County Attorneys Association.

Luci R. Botzek, St. Paul, for Amicus Curiae MN Corrections Association.

Wentzel & Fluegel, Wilbur W. Fluegel, Minneapolis, for Amicus Curiae MN Trial Lawyers Association.

## OPINION

ANDERSON, Justice.

In 1991, Scott Edward Stewart, a parolee on supervised release status, murdered Melissa Noelle Johnson. It is a basic, indeed obvious, rule of law that if one person murders another, the murderer is not only criminally liable for the offense, which will be prosecuted by the state, but is also civilly liable in tort to the estate of the victim. Thus, Stewart was prosecuted by the state for his criminal conduct, was convicted by a jury, and was sentenced to life in prison without the possibility of parole. Stewart is also liable civilly, in tort, to Johnson's estate for wrongfully causing Johnson's death.

But the issue presented by this appeal is not whether a murderer should be required to pay damages to the estate of his victim. Clearly a murderer is so liable. Rather, the issue is whether *the government* can be held liable to pay such damages.

This issue of liability is one that our constitutional system of separation of powers assigns to the legislative branch to decide as a matter of public policy. Exercising its power, the legislature has made two policy decisions relevant to the issue presented by this appeal. First, the legislature has enacted the Crime Victim Reparation Act which provides, among other things, for the state to pay reparations to the estate of a deceased victim if the estate has suffered economic loss. *See* Minn.Stat. § 611A.52–53 (1994). Second, while the legislature has abolished by statute the general rule of sovereign immunity—that the state is immune from suit by its citizens—it has retained certain aspects of the general rule. This immunity from suit protects government entities and public officials from tort actions that would result in judicial second-guessing and after-the-fact review of legislative policy decisions or judicial review of discretionary decision-making or policymaking, rather than merely ministerial duties.

In the case before us, we must address these liability issues as they arise from the events surrounding the tragic death of Melissa Johnson. Johnson, a student at St. Cloud State University, was raped and murdered by Stewart. Respondents, trustees for the heirs and next-of-kin of Johnson (trustees), commenced a wrongful death action against appellants, State of Minnesota and its agents, Hennepin County and its agents, and 180 Degrees, Inc., a halfway house (180 Degrees). The trustees alleged that appellants had a duty to control Stewart while he was a parolee on supervised release status and that their negligence caused Johnson's death. The district court dismissed the trustees' wrongful death action on the grounds that the trustees' claims against the state, the county, and their agents are barred by statutory immunity and official immunity[1] and

---

1. Statutory immunity pursuant to Minn.Stat. § 3.736, subd. 3(b) (1994) and Minn.Stat. § 466.03, subd. 6 (1994) has been referred to as statutory discretionary function immunity, statu-

because 180 Degrees had no duty to control Stewart or to warn Johnson. The Minnesota Court of Appeals reversed and held that the trustees' claims were not barred by statutory immunity and official immunity, that there was a duty to control Stewart, and that Johnson's rape and murder was foreseeable.

The state, the county, their agents, and 180 Degrees appeal, asking this court to determine whether, under the laws of this state, they are subject to suit and potential liability for damages suffered by Johnson's heirs and next-of-kin. After reviewing and considering the facts and the relevant law, we conclude that the court of appeals erred when it held that the trustees' claims were not barred by statutory immunity and official immunity and also erred when it held that there was a duty to control. Accordingly, we reverse.

The events which led to Johnson's rape and murder are as follows. At approximately 12:00 p.m. on Independence Day, Thursday, July 4, 1991, Scott Edward Stewart was released from Minnesota's maximum security prison in St. Cloud and told to report to 180 Degrees, a halfway house located in Minneapolis, Minnesota.[2] Stewart's parole agreement stated that he was to report directly to 180 Degrees and to telephone his supervising agent within 24 hours of his release. Stewart did neither; instead, he engaged in an eight-day crime spree.

During this crime spree, Stewart abducted Johnson at gunpoint in St. Cloud sometime between 11:00 p.m., July 8, and 1:00 a.m., July 9. He forced Johnson into his car and drove her to the outskirts of the city, where he raped her. Stewart then stabbed Johnson to death. Stewart surrendered to the police three days later. He confessed to the abduction, rape, and murder of Johnson, and, after a trial, was sentenced to life imprisonment without parole.

tory discretionary immunity, discretionary function immunity, and discretionary immunity. For purposes of this appeal, when referring to this legal concept, we use the term statutory immunity. Similarly, official immunity has also been referred to as common law official immunity. For purposes of this appeal, when referring to this legal concept, we use the term official immunity.

In addition to other offenses, Stewart's record reveals two prior convictions for criminal sexual conduct, both of which crimes were committed while he was on parole. After completing two-thirds of his sentence for the second conviction for criminal sexual conduct, Stewart was released from prison on July 4, 1991, on the condition that he reside at a halfway house. Stewart's release from prison and placement in a halfway house conforms with the criminal justice policy of this state. When a prisoner has served at least two-thirds of a sentence and has earned "good time," the Executive Officer of Adult Release may authorize the prisoner's release from prison and referral to a supervised release program, such as a halfway house. Minn.Stat. §§ 244.04, 244.05, subd. 1 (1994); Minn. R. 2940.0300, 2940.0400 (1995). If accepted into the supervised release program, the prisoner serves the balance of the sentence in accordance with a release plan established by the Executive Officer of Adult Release in cooperation with the prisoner's assigned supervising agent. Minn.Stat. § 244.05; Minn. R. 2940.1200, 2940.1300 (1995). The release plan establishes the terms of the prisoner's release, which terms are memorialized in a supervised release agreement. If the released prisoner violates any of the release terms at any point during the term of supervised release, the state may incarcerate the prisoner. Minn.Stat. § 244.05, subd. 3. If, upon release, the prisoner fails to report to the halfway house or fails to contact his supervising agent, a presumption arises in favor of reincarceration. Minnesota Dept. of Corrections Policy Manual § 4–115.9(11) (1994) (DOC Policy Manual).

The legal issues in this case center on Stewart's supervised release agreement, which provided that:

Within 24 hours of release the releasee shall report to the residence specified in

2. In 1992, after Stewart's release, the legislature amended the supervised release statute to require that an agent from the DOC escort inmates who are placed on supervised release status to halfway houses or residential community programs. Act of Apr. 29, 1992, ch. 571, art. 11, § 6, 1992 Minn. Laws 1983, 2005, *codified at* Minn.Stat. § 244.05, subd. 1c (1994).

this agreement. The releasee shall also report to the supervising agent by telephone or by personal visit within 24 hours of release, weekends and holidays excluded, unless otherwise directed by agent. If a releasee is mandated for residential placement, the releasee shall proceed directly to the residential facility as stated in this release agreement and report to the staff on duty at the date and time as specified by the staff and or agent.

Stewart's supervised release agreement also provided that "[i]f a releasee fails to report as directed to the residential facility or residence specified in this agreement, a fugitive warrant shall be issued immediately."

Stewart failed to report to 180 Degrees as required, but a fugitive warrant was not issued until Monday, July 8. The record reflects the reasons for this delay were as follows. Thomas Lamb, Stewart's supervising agent, was on vacation on Thursday, July 4, the day Stewart was released. Lamb was also on vacation on Friday, July 5, the day Stewart was to report to 180 Degrees. The county did have an officer on duty that day to assume the responsibilities of any supervising agents who were on vacation. When Lamb returned to work on Monday, he telephoned 180 Degrees and learned that Stewart had failed to report. Lamb immediately telephoned the Department of Corrections (DOC) Deputy Executive Officer of Adult Release, who authorized the issuance of a fugitive warrant at approximately 10:35 a.m. As often occurs, there was a passage of time between the issuance of the fugitive warrant and the apprehension of the fugitive. Stewart was arrested on Friday, July 12, four days after the issuance of the warrant.

After Stewart's arrest and conviction, the trustees brought a wrongful death action alleging that the state, the county, and their agents were negligent in implementing the terms of Stewart's release and that such negligence caused Johnson's death. The state, the county, and their agents moved to dismiss the wrongful death action pursuant to Minn.R.Civ.P. 12.02(e) for failing to state a claim upon which relief can be granted. The district court granted the motions on the grounds that the trustees' claims are barred

by statutory immunity and official immunity, and that no duty of care was owed to Johnson. The court also granted 180 Degrees' motion to dismiss on the grounds that 180 Degrees did not owe a duty to control Stewart or to warn Johnson.

The trustees appealed to the court of appeals, which affirmed in part and reversed and remanded in part. The court held that the failure to determine Stewart's whereabouts after his release and the failure to obtain a warrant were ministerial failures unprotected by statutory immunity or official immunity. *Johnson v. State,* 536 N.W.2d 328, 334–35 (Minn.App.1995). The court also held that there was a duty to control Stewart and determine his whereabouts, as well as a duty to immediately issue a warrant upon Stewart's violation of his supervised release plan. *Id.* at 335–36. Finally, the court concluded that it was foreseeable that Stewart would attempt to escape and engage in criminal sexual conduct. *Id.* at 336.

On appeal to this court, the state, the county, and their agents argue that their alleged failure to determine whether Stewart had arrived at 180 Degrees and their alleged failure to immediately issue a warrant are protected by statutory immunity and official immunity. They, along with 180 Degrees, also argue that there was no duty to control Stewart and that Johnson's death was not foreseeable as a matter of law.

## I.

■ We first must decide whether the district court properly dismissed the trustees' claims against the state, the county, and their agents on the grounds of statutory immunity and official immunity. Whether government entities and public officials are protected by statutory immunity and official immunity is a legal question which this court reviews de novo. *See Snyder v. City of Minneapolis,* 441 N.W.2d 781, 786 (Minn.1989). Under the Minnesota Tort Claims Act, the state is immune from liability for "a loss caused by the performance or failure to perform a discretionary duty, whether or not the discretion is abused." Minn.Stat. § 3.736, subd. 3(b) (1994). A county is similarly immune from liability for "any claim based upon the per-

formance or failure to perform a discretionary function or duty whether or not the discretion is abused." Minn.Stat. § 466.03, subd. 6 (1994).

Statutory immunity protects "policy-making activities that are legislative or executive in nature." *Nusbaum v. Blue Earth County,* 422 N.W.2d 713, 718 (Minn. 1988). Policymaking activities at the planning level are protected, while conduct at the operational level generally is unprotected. *Id.* at 719. In addition to examining whether a government activity is planning or operational, courts must also consider whether the legislature intended to immunize the particular government activity that is the subject of the tort action. *Nusbaum,* 422 N.W.2d at 719 (citing *United States v. Varig Airlines,* 467 U.S. 797, 813, 104 S.Ct. 2755, 2764, 81 L.Ed.2d 660 (1984)).

In contrast to statutory immunity, which protects government entities, official immunity protects public officials. The doctrine of official immunity establishes that " 'a public official charged by law with duties which call for the exercise of his judgment or discretion is not personally liable to an individual for damages unless he is guilty of a willful or malicious wrong.' " *Elwood v. County of Rice,* 423 N.W.2d 671, 677 (Minn. 1988) (quoting *Susla v. State,* 311 Minn. 166, 175, 247 N.W.2d 907, 912 (1976)). The discretion involved in official immunity differs from the policymaking type of discretion involved in statutory immunity. Official immunity involves the kind of discretion which is exercised on an operational rather than a policymaking level, and it requires something more than the performance of merely "ministerial" duties. *Id.* at 677; *Pletan v. Gaines,* 494 N.W.2d 38, 40 (Minn.1992). This court has defined a ministerial duty as "absolute, certain, and imperative, involving merely the execution of a specific duty arising from fixed and designated facts." *Cook v. Trovatten,* 200 Minn. 221, 224, 274 N.W. 165, 167 (1937); *see, e.g., Larson v. Independent Sch. Dist. No. 314,* 289 N.W.2d 112, 120–21 (Minn.1979) (supervising and teaching a gymnastics exercise a ministerial duty); *Williamson v. Cain,* 310 Minn. 59, 245 N.W.2d 242, 244 (1976) (dismantling an abandoned house a ministerial duty). Public officials may raise official immunity as a defense against claims or opinions resulting from the conduct of third persons. *See Olson v. Ramsey County,* 509 N.W.2d 368, 372 (Minn.1993) (social worker protected by official immunity when determining level of services to provide to protect her client from child abuse); *Pletan,* 494 N.W.2d at 41 (police officer protected by official immunity for decision to engage in and to continue high-speed car chase).

This court has repeatedly held that the decision to release a patient is protected as a discretionary function. *Papenhausen v. Schoen,* 268 N.W.2d 565, 572 (Minn.1978); *Cairl v. State,* 323 N.W.2d 20, 23–24 (Minn. 1982). In *Papenhausen,* this court held that official immunity barred suit against members of a parole board who approved the medical parole of a mentally ill prisoner who escaped from a state hospital and raped a woman.[3] 268 N.W.2d at 571–72. Immunity applied because the performance of the parole board's duties required "each member of the board to personally evaluate a body of data and make a discretionary judgment based on that evaluation," *id.* at 572, and because "[t]he selection and monitoring of treatment programs" is "an indisputably discretionary activity, involving as it does the application of skilled judgment to a wide variety of human conditions." *Id.*

In *Cairl,* this court held that statutory immunity barred suit against a hospital for

---

3. The events giving rise to the litigation in *Papenhausen* took place before this court abolished the doctrine of sovereign immunity in *Nieting v. Blondell,* 306 Minn. 122, 235 N.W.2d 597 (1975). Therefore, *Papenhausen* was decided under the doctrine of sovereign immunity as it existed before *Nieting.* Applying the doctrine of sovereign immunity, this court held that the state was not liable in tort for negligence. *Papenhausen,* 268 N.W.2d at 568–70. The court also concluded that the activities of the individual members of the parole board and the medical chief of the state hospital named as defendants involved "discretionary governmental activity" and were not "merely ministerial"; but, in so doing, the court mislabeled the doctrine by using the term "discretionary immunity." *See id.* at 571, 572. The correct term is official immunity, which protects public officials.

the decision to release a mentally retarded youth, who had a long history of pyromania, for a Christmas home visit. 323 N.W.2d at 23–24. Although the youth had started a fire in his mother's apartment, killing one person and severely injuring another, we held the hospital immune from suit because:

> The decision to release [the youth], involving as it does the professional evaluation of such factors as the protection of the public, his physical and psychological needs, the relative suitability of the home environment, and the need to reintegrate him into the community, is precisely the type of governmental decision that discretionary [statutory] immunity was designed to protect from tort litigation by after-the-fact review.

*Id.* at 23. We also emphasized that imposing liability would "undermine a statewide policy favoring open door treatment rather than custodial detention of the state's mentally ill." *Id.* at 23 n. 3. *See also Erickson v. Curtis Inv. Co.*, 432 N.W.2d 199, 203 (Minn. App.1988) (parole decision a discretionary function), *aff'd,* 447 N.W.2d 165 (Minn.1989).

 *Papenhausen, Cairl* and *Erickson* are helpful because they establish that a decision to release is a protected discretionary function. However, this appeal raises a related question: whether this well-established precedent should be applied to protect as a discretionary function the state's and county's alleged failure to determine if Stewart had arrived at the halfway house, and their alleged failure to issue a fugitive warrant when he did not arrive there within 24 hours of release.

Other courts have concluded that statutory immunity bars suit for the negligent supervision of a parolee. *See, e.g., Weissich v. United States,* 4 F.3d 810, 815 (9th Cir.1993) (discretionary function exception shielded federal probation service from liability for any negligence in supervising probationer who shot and killed his prosecutor), *cert. denied,* — U.S. ——, 114 S.Ct. 2705, 129 L.Ed.2d 833 (1994); *Moore v. Commissioner, Dep't of Justice,* 114 Pa.Commw. 56, 58–64, 538 A.2d 111, 113–15 (1988) (immunity protected prison superintendent for state prison furlough of an inmate who shot eyewitness to

armed robbery while on furlough). The court of appeals reached a similar result in *Koelln v. Nexus Residential Treatment Facility,* holding that the State of Minnesota and Ramsey County were entitled to statutory immunity in connection with the rape of a woman by a residential treatment facility parolee with a history of sex crimes who had been adjudged a psychopathic personality. 494 N.W.2d 914, 920 (Minn.App.1993), *pet. for rev. denied* (Minn., March 22, 1993). The assailant had previously walked away from the treatment facility and, when apprehended the first time, stated that, during his absence, he had been looking for someone to rape. *Id.* at 917. Even though the assailant subsequently committed a rape after a second flight from the treatment facility, the court barred suit on statutory immunity grounds, stating that:

> Appellate courts have held decisions regarding the placement of inmates and patients, and *decisions regarding how much liberty to afford them,* are protected policy decisions immune from suit under the doctrine of discretionary [statutory] immunity.

*Id.* at 919–20 (emphasis added).

 We find these authorities persuasive and conclude that the state and the county are protected by statutory immunity, and their agents by official immunity, for the alleged failure to determine whether Stewart had arrived at 180 Degrees. In reaching this conclusion, we recognize that our system of government leaves a wide range of policy choices to the executive and legislative branches of the government and not the judiciary. Numerous protected policymaking considerations provided for by statute and administrative rule, such as the safety of the public, Stewart's rehabilitation and treatment needs, and Stewart's reintegration into the community, were balanced in establishing the terms and conditions of Stewart's supervised release. The decision to call 180 Degrees to determine if Stewart had arrived there was a protected discretionary decision regarding how much liberty to afford him. *See Koelln,* 494 N.W.2d at 919–20. In reaching this result, we also recognize that imposing liability would undermine public policy clearly manifested by the legislature in the statutes of

this state providing for the release of parolees into the community. *See Cairl,* 323 N.W.2d at 23 n. 3. While supervised release is a complex policy that is sometimes fraught with danger for innocent citizens, it remains a policy choice of the legislature that is protected from judicial second-guessing. To impose liability would bring into question the propriety of the supervised release program itself. We further conclude that the state is also entitled to statutory immunity and its agents to official immunity for the alleged failure to immediately obtain a fugitive warrant. The state issued the warrant precisely in the manner contemplated by the applicable rule. Minnesota Rule 2940.3200 (1995) provides that the DOC Executive Officer of Adult Release has the authority to issue warrants in accordance with the following procedure:

A. After consultation with his or her supervisor, the supervising agent shall submit a violation report to the executive officer of adult release who shall make the final decision regarding the issuance of a warrant.

B. In emergency situations the supervising agent shall request authorization for the warrant by telephone. The supervising agent shall call the office of adult release and provide the necessary information for warrant authorization.

C. Upon approval of the emergency warrant, the office of adult release shall provide the fugitive unit with the necessary information, and instruct the fugitive unit to issue the warrant.

When the DOC was informed that Stewart had failed to appear at 180 Degrees, the DOC immediately issued a warrant for Stewart's arrest. Because the state balanced protected policy considerations in setting up the warrant process and then followed the applicable policy, procedure and administrative rule in issuing the warrant, the state is entitled to statutory immunity and its agents to official immunity.

The county also is entitled to statutory immunity and its agents to official immunity for the alleged failure to immediately obtain a fugitive warrant. The court of appeals held that the county's failure to determine whether Stewart had been released and had reported to the halfway house on July 5 was a "ministerial failure" unprotected by statutory immunity. *Johnson,* 536 N.W.2d at 334. In reaching its conclusion, the court relied on DOC Policy Manual Section 4-115.9(11) (1991), *amended by* DOC Policy Manual § 4-115.9(11) (1994), which provides that: "[I]f a releasee fails to make his/her first appointment with the supervising agent, or fails to report to the residential program, a fugitive warrant shall immediately be issued." The court interpreted the language requiring that "a fugitive warrant shall immediately be issued" to require that the county supervising agent initiate the communication to discover whether the parolee had failed to report to a program or contact the supervising agent. *Johnson,* 536 N.W.2d at 333–34.

The county's custom and practice has been to rely upon the halfway house to notify it of a parolee's nonarrival. This communications practice is premised on the fact that the county often does not know the exact date of release because the projected release date is subject to change, depending on the parolee's behavior in prison. By its terms, the DOC Policy Manual does not set forth "absolute, certain, and imperative" ministerial duties for the conduct of county supervising agents. *See Cook,* 200 Minn. at 224, 274 N.W. at 167. The DOC Policy Manual uses the passive voice; it does not set forth which party, if any, is responsible for determining whether a parolee has been released or has reported to the halfway house. The language in the DOC Policy Manual does not prohibit the county from relying upon an established communications policy to acquire information from others about the status of the parolee. We thus conclude that the county is entitled to statutory immunity and its agents to official immunity for the alleged failure to immediately issue a fugitive warrant.

## II.

The state and the county, along with 180 Degrees, also argue that they had no duty to control Stewart and determine his whereabouts when Stewart failed to arrive at 180

Degrees or to telephone Lamb as instructed, and had no duty to immediately issue a warrant upon Stewart's violation of his supervised release plan. Because the state and county are protected by statutory immunity and their agents by official immunity, we need not reach the issue of whether they had a duty to control Stewart or to immediately issue a warrant. Our focus is limited to 180 Degree's duty to control Stewart.

 The elements necessary to maintain a claim for negligence are (1) duty; (2) breach of that duty; (3) that the breach of duty be the proximate cause of plaintiff's injury; and (4) that plaintiff did in fact suffer injury. *Hudson v. Snyder Body, Inc.,* 326 N.W.2d 149, 157 (Minn.1982) (quoting *Schmanski v. Church of St. Casimir of Wells,* 243 Minn. 289, 292, 67 N.W.2d 644, 646 (1954)). The existence of a legal duty is generally a question of law, subject to de novo review. *ServiceMaster of St. Cloud v. GAB Business Services, Inc.,* 544 N.W.2d 302, 307 (Minn.1996).

 The fact that an actor realizes or should realize that action on his part is necessary for another's aid or protection does not of itself impose upon the actor a duty to take such action. Restatement (Second) of Torts § 314 (1965) (Restatement). Under fundamental principles of tort law,

> There is no duty so to control the conduct of a third person as to prevent him from causing physical harm to another unless
> (a) a special relation exists between the actor and the third person which imposes a *duty* upon the actor *to control* the third person's conduct, or
> (b) a special relation exists between the actor and the other which gives rise to the other a right to protection.

Restatement § 315 (emphasis added). In *Delgado v. Lohmar,* the court observed that such "special relationships exist between parents and children, masters and servants, possessors of land and licensees, common carriers and their customers, or people who have *custody* of a person with dangerous propensities." 289 N.W.2d 479, 483–84 (Minn.1979) (emphasis added).

 Restatement § 319 also states:

> One who *takes charge* of a third person whom he knows or should know to be likely to cause bodily harm to others if not controlled is under a duty to exercise reasonable care to control the third person to prevent him from doing such harm.

(Emphasis added.)

 180 Degrees argues that it had no legal "duty to control" Stewart under Restatement § 315, that it did not have "custody" of Stewart under *Delgado,* and that it did not "take charge" of him pursuant to Restatement § 319. This court's treatment of duty under these sections of the Restatement is instructive, but not controlling, because our previous cases have arisen in the context of hospital patients, not prison parolees. *See Lundgren v. Fultz,* 354 N.W.2d 25 (Minn. 1984); *Rum River Lumber Co. v. State,* 282 N.W.2d 882 (Minn.1979).

In *Rum River,* the court considered Restatement §§ 315 and 319 and held that a hospital has a duty to control the conduct of a patient when the hospital has custody over the patient and foresees an unreasonable risk of harm by the patient. 282 N.W.2d at 885. In *Rum River,* a young person with a history of violent behavior and mental illness escaped from the hospital and set a fire which destroyed a large portion of a lumberyard. *Id.* at 883. The patient had a history of prior escapes from the hospital. The court found a duty to control based on the factors of known dangerous propensities, foreseeability of harm, and opportunity or authority to control the patient. *Id.* at 886.

This court has held that under Restatement §§ 315 and 319, a psychiatrist may be held liable for affirmatively helping his patient gain access to deadly weapons. 354 N.W.2d at 29. In *Lundgren,* the psychiatrist was aware that the patient had twice been observed brandishing handguns in public places, knew of the patient's violent thoughts and expression, including his fixation with guns and fear of harming others, and had been told by a police captain that it would be extremely unwise to return handguns to the patient unless he was cured. *Id.* at 28. The court concluded that the limit to the protection given the discretion in a professional

relationship is "exceeded where a psychiatrist places the gun in a potential assassin's hand under the guise of fostering trust between patient and psychiatrist." *Id.* at 29. *Lundgren* is distinguishable from the present case because the patient in *Lundgren* was mentally ill and there was overwhelming evidence that the patient should not have been given handguns. Even more critically, *Lundgren* states that "[i]mplicit in the duty to control is the *ability* to control." *Id.* at 27.

We find no basis in the case law nor in this court's treatment of relevant provisions of the Restatement to impose a legal duty on 180 Degrees under the facts and circumstances of this case. *Delgado* and *Rum River* do not apply here because 180 Degrees neither had custody of Stewart nor had entered into a special relationship with him due to his failure to arrive at the halfway house. *See Delgado*, 289 N.W.2d at 483–84; *Rum River*, 282 N.W.2d at 885. *Lundgren* also does not apply because 180 Degrees had no "ability to control" Stewart due to his failure to arrive at the halfway house. See *Lundgren*, 354 N.W.2d at 27. Stewart's release from prison without supervision was an initial and virtually irremediable relinquishing of control such that 180 Degrees cannot be held to have a legal duty to "reassert" control over him. We reverse the court of appeals and hold that, under the facts and circumstances of this case, 180 Degrees had no legal duty to control Stewart.

### III.

Because the state and the county are protected by statutory immunity, and their agents by official immunity, we need not reach the issue of whether the state and the county owed a duty to Johnson under the special duty test enunciated in *Cracraft v. City of St. Louis Park*, 279 N.W.2d 801, 806 (Minn.1979). Similarly, because the state and county are protected by statutory immunity, and their agents by official immunity, and because 180 Degrees had no duty to

control Stewart, we need not reach the issue of foreseeability.

Reversed.

PAGE and GARDEBRING, JJ, dissent.

PAGE, Justice (dissenting).

I respectfully dissent. The court's broad holding that governmental entities are protected by statutory immunity for all of their decisions, actions, and/or inaction involving supervised release of an inmate goes too far.[1] The court is, in essence, saying that no matter what the governmental conduct, if it involves the supervised release of an inmate, the governmental entity is immune from suit whether or not it would be entitled to immunity under the standards articulated in our prior cases. We have said repeatedly that immunity is to be construed narrowly, as it is the exception to the general rule of governmental liability. *Cairl v. State*, 323 N.W.2d 20, 23 (Minn.1982). The blanket immunization granted here allows the exception to swallow the rule and renders the court's decision in *Nieting v. Blondell*, 306 Minn. 122, 235 N.W.2d 597 (1975), abrogating sovereign immunity, a nullity as it relates to the supervised release of prison inmates. *Cf.* Minn.Stat. §§ 3.736, subd. 1, 466.02 (1994) (providing for tort liability against the state and its political subdivisions, respectively, thereby affirming the abrogation of sovereign immunity).

The statutory immunity involved here is appropriately analyzed by determining whether the challenged governmental decisions/acts are of a "policy-making nature involving social, political or economic considerations" or whether the decisions/acts are "operational" in nature. *Nusbaum v. Blue Earth County*, 422 N.W.2d 713, 718–19 (Minn.1988). If the former, they are immune, but if the latter, they are not entitled to immunization. *Id.* at 722. The parties seeking statutory immunity bear the burden of establishing that they are entitled to immunity. *Cf. Bolyard v. Dept. of Social & Rehabilitation Servs.*, 259 Kan. 447, 912 P.2d

---

1. While I also believe that the evidence in the record is insufficient to determine whether the individual defendants are entitled to official immunity, I do not intend to discuss that issue further.

729, 732–33 (1996) ("governmental liability [is] the rule and immunity the exception," therefore, the "governmental entity bears the burden to establish immunity"). The governmental entities involved have not done so here. The underlying rationale for statutory immunity is that courts should not second-guess "policy-making" decisions of the legislative and executive branches of government. *Nusbaum*, 422 N.W.2d at 718. "To decide whether the discretionary function exception applies in this case, we must identify the precise government conduct being challenged." *Id.* at 722.

Here, the court has concluded that the state is protected by statutory immunity because:

> Numerous protected policy-making considerations provided for by statute and administrative rule, such as the safety of the public, Stewart's rehabilitation and treatment needs, and Stewart's reintegration into the community, were balanced in establishing the terms and conditions of Stewart's supervised release.

This, however, begs the question because the Johnsons' complaint is not a challenge to the social, political, or economic considerations underlying the legislative policy of releasing inmates such as Stewart; rather, the Johnsons' complaint challenges the implementation of Stewart's release. By the above statement, it appears that the court has concluded that every act involved and every decision made relating to Stewart's release was of a "policy" nature and that none of the decisions/acts were operational. This conclusion eliminates the "policy-making/operational" distinction the court identified in *Nusbaum* and immunizes all of the governmental entities' operational decisions/acts. I believe there is a distinction to be made between the decision and the underlying policy reasons for releasing an inmate and the implementation of the individual inmate's release. The operational decisions/acts involved in implementing Stewart's supervised release should not be immune from suit. *See Division of Corrections v. Neakok,* 721 P.2d 1121, 1134 (Alaska 1986) ("While the discretionary function exception immunizes the formulation of

policy, the state may be held liable if that policy is negligently implemented").

GARDEBRING, Justice (dissenting).

I join in the dissent of Justice Page.