*This opinion is nonprecedential except as provided by Minn. R. Civ. App. P. 136.01, subd. 1(c).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A25-0775
A25-0788
A25-0881**

Richard Joseph Terfehr, et al.,
Respondents,

vs.

Buffalo-Red River Watershed District, et al.,
Defendants,

Wilkin County Soil & Water Conservation District,
Appellant (A25-0775),

* * *

Richard Joseph Terfehr, et al.,
Respondents,

vs.

Buffalo-Red River Watershed District,
Appellant (A25-0788),

Ehlert Excavating, LLC, et al.,
Defendants.

* * *

Richard Joseph Terfehr, et al.,
Respondents,

vs.

Buffalo-Red River Watershed District, et al.,
Defendants,

Ehlert Excavating, LLC, et al.,
Appellants. (A25-0881)

**Filed March 16, 2026**
**Affirmed**
**Bentley, Judge**

Wilkin County District Court
File No. 84-CV-24-16

Tamara O'Neill Moreland, Inga K. Kingland, Larkin Hoffman Daly & Lindgren Ltd. Minneapolis, Minnesota (for respondents)

Curtis D. Ripley, Pemberton Law, P.L.L.P., Alexandria, Minnesota (for appellant Wilkin Soil and Water Conservation District)

Daniel Brees, David A. Schooler, Taylor Doerfler, Gordon Rees Scully Mansukhani, LLP, Minneapolis, Minnesota (for appellant Buffalo-Red River Watershed District)

William L. Davidson, Eric J. Steinhoff, Patrick J. Larkin, Lind, Jensen, Sullivan & Peterson, P.A., Minneapolis, Minnesota (for appellants Ehlert Excavating, LLC, et al)

Considered and decided by Bentley, Presiding Judge; Bratvold, Judge; and Schmidt, Judge.

## NONPRECEDENTIAL OPINION

**BENTLEY**, Judge

Respondent-landowners brought this litigation after trees were removed and the land was reshaped on their properties during a municipal project to restore a creek. Appellants are the watershed district overseeing the project, the soil and water conservation district that supported the watershed district in securing easements for the project, and the entities that were contracted to carry out the work. The landowners' claims include breach of temporary easement agreements, fraud in the inducement, and trespass. The landowners seek damages and declaratory and injunctive relief.

The procedural history in this case is complex, but the issues raised in these consolidated, interlocutory appeals are narrow. Each appellant asserted either statutory immunity or common-law official immunity as a defense to the litigation and the district court rejected those assertions on cross-motions for summary judgment. Appellants challenge only those immunity decisions on appeal. We agree with the district court that none of the appellants are entitled to immunity and therefore affirm.

**FACTS**

The following facts derive from the summary-judgment record, viewed in the light most favorable to the landowners, the nonmoving parties, with respect to the assertions of immunity.[1]

***Whiskey Creek Restoration Project***

Appellant Buffalo-Red River Watershed District's (BRRWD) board of directors voted in 2021 to begin the Whiskey Creek Restoration Project to address decades of sediment build-up, flooding, and poor water quality in Whiskey Creek—a tributary to the Red River located in an agricultural area of western Minnesota. To stabilize the creek, the project included reshaping a section of the creek to a more natural zigzag design.

---

[1] One of the appellants, Buffalo-Red River Watershed District (BRRWD) did not move for summary judgment, but it invoked immunity as a defense in its opposition brief to the landowners' summary-judgment motion. The district court construed its argument as a motion for immunity and denied it. We therefore view the landowners as the nonmovants on the issue of BRRWD's immunity. That said, even if the landowners were the moving parties for purposes of our review, our decision with respect to BRRWD is based on undisputed facts, such that viewing them in the light most favorable to BRRWD would not change our analysis.

Several entities contributed to the Whiskey Creek project. BRRWD led the design and implementation of the project. Appellant Wilkin County Soil and Water Conservation District (SWCD) helped acquire funding and private land access around the creek to facilitate construction. SWCD was also tasked with community outreach and its office was used as a place for landowners to notarize paperwork relating to the project.

Both BRRWD and SWCD are political subdivisions under state law. BRRWD is a watershed district governed by the Watershed Law, Minn. Stat. §§ 103D.001-.925 (2024 & Supp. 2025), broadly tasked to "conserve the natural resources of the state by land use planning, flood control, and other conservation projects." Minn. Stat. § 103D.201, subd. 1. BRRWD's more specific tasks include working to "protect, improve, or restore watercourses and water basins for drainage, navigation, water quality, flood mitigation, and any other public purpose." *Id.*, subd. 2(2). BRRWD is also a municipality under Minnesota Statute section 466.01, subdivision 1 (2024) (including political subdivisions within the definition of municipality). *See also Landview Landscaping, Inc. v. Minnehaha Creek Watershed Dist.*, 569 N.W.2d 237, 240 (Minn. App. 1997*)* (applying section 466.01 to a watershed district), *rev. denied* (Minn. Dec. 22, 1997). SWCD is a soil and water conservation district governed by the Water Law, Minn. Stat. §§ 103C.001-.635 (2024 & Supp. 2025).

BRRWD contracts with external engineering firms to carry out projects related to its statutory duties as a watershed district. On the Whiskey Creek project, BRRWD contracted with nonparty Houston Engineering to plan and design the project, as well as to oversee construction of improvements to the creek. Appellant Ehlert Excavating was

4

contracted to perform certain construction work on the project, which included tree removal and excavation.[2]

### Planning Phase

To begin the restoration of Whiskey Creek, BRRWD had to secure temporary easements from private landowners whose properties surrounded the creek. BRRWD used tax records to identify the affected landowners. BRRWD employees identified respondents Richard and Audrey Terfehr and nonparties Larry and Elizabeth Terfehr as owning land impacted by the project.[3] Accordingly, BRRWD mailed temporary easement documents to both couples. As it turns out, Larry and Elizabeth own only a one-half interest in the land identified by BRRWD. Respondents Theodore and Marlene Terfehr own the other one-half interest in the same land. BRRWD did not identify Theodore and Marlene as property owners in its tax-records search and consequently did not contact them about an easement before starting construction. Larry and Elizabeth signed a temporary easement agreement with respect to their interest in the land in April 2023.

Richard and Audrey own two parcels of land near Whiskey Creek: one parcel is their farmstead, on which their home is located, and the other parcel is cropland. Richard

---

[2] Appellants Ehlert Excavating, Inc. (a North Dakota Corporation), Ehlert Excavating, LLC, Ehlert Excavating, Inc. f/k/a Ehlert Excavating INC INC (a Minnesota Corporation), and Jason Ehlert submitted a brief jointly. We refer to these parties collectively as "Ehlert Excavating."

[3] Several parties and nonparties share the Terfehr surname. We use the name "Terfehr parties" in this opinion to refer collectively to the family members who are parties to this litigation: Richard, Audrey, Theodore, and Marlene. When referring to individual family members, we use first names.

and Audrey received a contract for a temporary easement but hesitated to sign it. They visited the SWCD office in September 2022 to discuss their concerns about the proposed easement.

At SWCD's office, Richard and Audrey met with a manager for SWCD. SWCD characterized the manager's role on the project as "assist[ing] landowners in signing easements and answer[ing] minor questions." In their depositions, Richard and Audrey recalled expressing to the manager that they did not want their farmstead parcel touched by construction, and they also pointed out several groves of trees that they hoped to maintain. They claimed that the manager said the tree groves and farmstead would not be affected, but the manager also stated that BRRWD and SWCD owned a 10-foot right-of-way on either side of the creek, so they could work on that land regardless of whether Richard and Audrey signed an easement. Richard and Audrey believed the manager and signed the easement. Richard stated that the manager did not advise them to contact anyone else with questions about the construction.[4]

***Construction Phase***

Construction began on the Terfehr properties in October 2023. Houston Engineering staked out the project areas on the landowners' properties, and Ehlert Excavating used those markers to guide the excavation and tree removal.

---

[4] SWCD disputes Richard and Audrey's description of the meeting. The manager, in his deposition, maintained that he did not answer any engineering or project design questions. The manager maintains that he directed Richard and Audrey to talk to BRRWD and Houston Engineering "to discuss which trees were going to get removed, and then . . . if you have certain trees you want to save, make sure you stress those trees."

Ehlert Excavating began removing large quantities of trees that Richard and Audrey believed, based on their conversation with the SWCD manager, were outside the scope of the easement they had signed. Ehlert Excavating later entered the cropland owned in part by Theodore and Marlene to remove trees, even though BRRWD still had not obtained an easement from them.

Richard and Audrey expressed to Ehlert Excavating that they believed the work was unauthorized, but construction continued. The conflict grew more intense as more trees were removed and land disrupted. From October through December 2023, Richard and Audrey called the sheriff's office to remove Ehlert Excavating from the property several times and had multiple conversations with BRRWD and SWCD employees expressing frustration about the implementation of the project.

In December, the Terfehr parties sent a cease-and-desist email to BRRWD. BRRWD responded that construction would continue on Richard and Audrey's property but would stop on Theodore and Marlene's property until they could confirm who held the title to the property.

### Litigation

The Terfehr parties filed a ten-count complaint against BRRWD, SWCD, and Ehlert Excavating in January 2024. First, they alleged breach of the temporary easement agreement against BRRWD with respect to Richard and Audrey's land. Second, Richard and Audrey claimed fraud in the inducement against BRRWD, SWCD, and their agents, based on the misrepresentations the SWCD manager allegedly made about the scope of the temporary easement. Third and fourth, the Terfehr parties sought declaratory judgments

7

regarding the definition of the easement area on Richard and Audrey's land and the lack of authority to access Theodore and Marlene's land. Counts five through eight were trespass claims against all three groups of appellants with respect to both properties, and claims for treble damages on each trespass count. Counts nine and ten sought injunctive relief to stop all work and prevent access to each of the Terfehr parties' properties.

The case proceeded to summary judgment. The Terfehr parties moved for summary judgment on all claims, except fraud in the inducement, and they also moved to amend the complaint to seek punitive damages against BRRWD and Ehlert Excavating based on trespass. Ehlert Excavating moved for summary judgment, seeking dismissal of all claims against it and claiming it was immune from suit to the extent that BRRWD and SWCD are also immune. SWCD likewise cross-moved for summary judgment, seeking dismissal of all claims against it and arguing that it was protected by common-law official immunity on the fraud-in-the-inducement claim. BRRWD did not move for summary judgment, but in its brief opposing the Terfehr parties' summary-judgment motion, BRRWD argued that it was entitled to a statutory immunity defense.[5]

The district court granted each motion in part and denied each in part. The following aspects of the district court's summary-judgment order are relevant to this appeal. The district court denied BRRWD's assertion of statutory immunity with respect to the trespass claims because BRRWD failed to meet its burden to show that tree removal and the

---

[5] Statutory immunity is sometimes referred to as discretionary immunity. *See, e.g.*, *Janklow v. Minn. Bd. of Exam'rs for Nursing Home Adm'rs*, 552 N.W.2d 711, 715 (Minn. 1996) (noting that statutory immunity is another name for governmental or discretionary immunity).

landowner identification process involved the balancing of policy considerations. The district court denied SWCD's assertion of common-law official immunity with respect to the fraud-in-the-inducement claim. The district court did not expressly rule on Ehlert Excavating's assertions of immunity on the trespass claims, but because Ehlert Excavating tied its immunity claims to BRRWD and SWCD's claims, we construe the district court's decision as implicitly denying summary judgment on Ehlert Excavating's claim of immunity.[6] Finally, the district court granted the Terfehr parties' motion for leave to amend their complaint to add punitive damages against Ehlert Excavating with respect to the trespass claims.[7]

The district court reached additional conclusions in its summary-judgment order with respect to claims not subject to immunity—namely, the respondents' claims for breach of the temporary easement agreements, declaratory relief, and injunctive relief—but those issues are not before us in this interlocutory appeal.[8]

---

[6] The district court denied Ehlert Excavating's motion for summary judgment on all claims, except that it granted summary judgment to Ehlert Excavating on the fraud-in-the-inducement claim. The district court reasoned that the Terfehr parties failed to produce any evidence that Ehlert Excavating made false statements to induce Richard and Audrey to sign the easement agreement.

[7] The district court determined that Minnesota Statutes section 466.04, subdivision 1(b) (2024), prohibits claims of punitive damages against BRRWD.

[8] The parties agree that the immunity defenses apply only to the tort claims that were not dismissed at summary judgment. *See also City of Minneapolis v. Ames & Fischer Co. II*, 724 N.W.2d 749, 757 (Minn. App. 2006) (noting that statutory and common-law official immunity apply only to claims that sound in tort). Neither statutory immunity nor common-law official immunity are available for the breach-of-temporary-easement or declaratory-judgment claims. *See id.*; *McDonough v. City of Rosemount*, 503 N.W.2d 493, 497 (Minn

BRRWD, SWCD, and Ehlert Excavating appeal the district court's immunity decisions.

**DECISION**

These consolidated, interlocutory appeals arise from the district court's summary-judgment order that denied appellants' respective assertions of immunity. We review summary-judgment decisions de novo. *STAR Ctrs., Inc. v. Faegre & Benson, L.L.P.*, 644 N.W.2d 72, 76-77 (Minn. 2002). "On appeal from summary judgment, [appellate courts] review whether there are any genuine issues of material fact and whether the district court erred in its application of the law." *Id.* at 76. The legal question of whether an immunity defense applies to government entities or public officials is also one this court reviews de novo. *Johnson v. State*, 553 N.W.2d 40, 45 (Minn. 1996). Immunity is an "exception to the general rule of governmental liability," and courts interpret this exception narrowly. *S.W. v. Spring Lake Park Sch. Dist. No. 16*, 580 N.W.2d 19, 23 (Minn. 1998); *Cairl v. State*, 323 N.W.2d 20, 23 (Minn. 1982) (stating that immunity "must be narrowly construed" (quotation omitted)). The party arguing for immunity "bears the burden of proving [it] fits within the scope of the immunity." *Rehn v. Fischley*, 557 N.W.2d 328, 333 (Minn. 1997). When reviewing a denial of immunity at summary judgment, appellate courts "view the evidence in the light most favorable to the nonmoving party." *Gleason v. Metro. Council Transit Operations*, 582 N.W.2d 216, 217 (Minn. 1998).

---

App. 1993) ("A municipality must perform its valid contracts the same as an individual or private corporation." (quotation omitted)), *rev. denied* (Minn. Sept. 10, 1993).

Each appellant challenges the district court's denial of immunity and argues that its actions should be protected from litigation by either statutory immunity or common-law official immunity. We consider each of their arguments in turn.

**I**

BRRWD asserts on appeal that the district court erred in concluding that it is not entitled to a statutory immunity defense to the Terfehr parties' tort claims. BRRWD specifically argues that it provided sufficient facts to show that it engaged in policymaking activities both when it carried out its design plans for the Whiskey Creek project on the Terfehr parties' properties and when it identified the landowners impacted by the restoration project.

Statutory immunity originates from statutes, as the name implies. Minnesota Statutes section 466.02 provides that municipalities, including watersheds, are generally "subject to liability for [their] torts and those of [their] officers, employees and agents acting within the scope of their employment or duties whether arising out of a governmental or proprietary function." Minn. Stat. § 466.02 (2024); *see also* Minn. Stat. § 466.01, subd. 1 (listing "other political subdivision[s]" among municipalities). But the statute also provides that municipalities shall be immune from liability for "[a]ny claim based upon the performance or the failure to exercise or perform a discretionary function or duty, whether or not the discretion is abused." Minn. Stat. § 466.03, subd. 6 (2024).

To determine whether the challenged conduct is protected by statutory immunity, we first identify the precise government activity that is the subject of the claim. *Nusbaum v. County of Blue Earth*, 422 N.W.2d 713, 718-19 (Minn. 1988). Then, we determine

11

whether that conduct was "at a planning level (protected)" or "at an operational level (unprotected)." *Id.* at 719. Operational level activities are those performed in the ordinary day-to-day operation of government. *Holmquist v. State*, 425 N.W.2d 230, 232 (Minn. 1988). Planning decisions, meanwhile, "involve questions of public policy and are protected as discretionary decisions." *Steinke v. City of Andover*, 525 N.W.2d 173, 175 (Minn. 1994). Public policy considerations include "social, political, or economic considerations," but do not include "merely professional or scientific judgments." *Id.* To assess whether the conduct was at a planning or operational level, courts may look "(1) in the language of the statute authorizing the conduct; (2) in an examination of the conduct itself; or (3) in the policy determinations that give rise to the challenged conduct." *Waste Recovery Coop. of Minn. v. County of Hennepin*, 517 N.W.2d 329, 332 (Minn. 1994). In general, courts seek to determine "whether the legislature intended to immunize the particular government activity that is the subject of the tort action." *Johnson*, 553 N.W.2d at 46.

We begin by identifying the precise governmental conduct at issue here. *Nusbaum*, 422 N.W.2d at 718-19, 722-23 (identifying three specific acts and omissions by a county government as the challenged conduct). As noted above, BRRWD bases its immunity claims around two actions, each of which relate to the trespass claims: (1) "tree removal and design" of the project, and (2) "identifying potentially impacted landowners . . . utilizing county tax records."[9] The first identified action requires more nuanced

---

[9] BRRWD does not identify conduct that would be subject to immunity with respect to the fraud-in-the-inducement claim.

12

consideration than the second. The conduct at issue for purposes of the trespass claims is not so broad as to include the design of the entire project, or BRRWD's decision to undertake the project in the first place. Rather, the relevant conduct is the decision to enter the Terfehr parties' land to implement the project. *See Johnson v. Paynesville Farmers Union Coop. Oil Co.*, 817 N.W.2d 693, 703 (Minn. 2012) (defining trespass as "entry upon the land that interferes with the landowner's right to exclusive possession"). We therefore consider the following conduct for purposes of the statutory immunity analysis: (1) BRRWD's decision to enter the Terfehr parties' land to implement the project, including to remove trees, and (2) BRRWD's identification of landowners impacted by the Whiskey Creek project using county tax records.

The next step of statutory immunity analysis is to determine whether that conduct is operational or planning activity. *Nusbaum*, 422 N.W.2d at 719. BRRWD argues that the challenged conduct derives from BRRWD's discretionary planning decisions, which "involved social and economic considerations." BRRWD further argues that these tasks are part of its statutory purposes under Minnesota Statutes section 103D.201 and were undertaken pursuant to Minnesota Department of Natural Resources permits necessary to perform work on public waterways, and the tasks are therefore the type of acts the legislature intended to immunize. *See* Minn. Stat. § 103D.201, subds. 1-2. We are unpersuaded by BRRWD's arguments.

Turning first to BRRWD's decision to carry out the project by entering the Terfehr parties' lands and removing trees, we determine that this conduct was operational because it was largely based on the professional and scientific judgment of Houston Engineering,

not policy considerations. *See Steinke*, 525 N.W.2d at 175. Undisputed evidence in the record shows that project plan implementation was delegated to Houston Engineering. For example, an employee of BRRWD stated in her deposition that Houston Engineering employees oversaw construction, provided the survey information for the temporary easements, had "the technical knowledge on the specifics that were happening on the landscape," and verified tree removal. The owner of Ehlert Excavating also testified in his deposition that he removed trees solely based on Houston Engineering's staked-out boundaries and that he talked to Houston Engineering "before we remove[d] anything, especially . . . along landowners' properties." The exercise of professional and scientific judgment is not considered planning-level conduct entitled to immunity. *See id.* ("Discretionary immunity protects the government only when it can produce evidence its conduct was of a policy-making nature involving social, political, or economic considerations, rather than merely professional or scientific judgments."); *Christensen v. Mower County*, 587 N.W.2d 305, 307 (Minn. App. 1998) ("[E]xercising solely professional judgment as to . . . non-policy factors, is not discretionary.").

BRRWD argues that decisions that involve both professional judgments and policy considerations are still protected by statutory immunity. *See Fisher v. County of Rock*, 596 N.W.2d 646, 652 (Minn. 1999) ("[I]f in addition to professional or scientific judgments, policy considerations played a part in making a decision, then planning level conduct is involved and statutory immunity applies."). But BRRWD does not point to evidence in the record that Houston Engineering balanced policy considerations in making implementation decisions. In cases in which immunity was found to protect mixed professional and policy

14

decisions, the connection between a discretionary policy decision and the challenged conduct was more direct. *See, e.g.*, *Fisher*, 596 N.W.2d at 653 (determining that the decision not to install guardrails on a bridge was based on engineering considerations and a county policy that required balancing safety with economic burdens). Here, BRRWD points to many broad policy decisions it made on the Whiskey Creek project overall, but it fails to connect the implementation of the project, including the removal of the Terfehr parties' trees, to a specific planning action that required BRRWD to balance policy objectives. Indeed, an engineer with Houston Engineering stated in his deposition that tree removal decisions were based on "slope stability," which was in turn "determined based off of engineering judgment." We therefore conclude that BRRWD's conduct, as related to its decision to enter the Terfehr parties' properties and to implement project plans, was operational.

We also conclude that BRRWD's identification of landowners was an operational decision that did not include the balancing of policy objectives. BRRWD argues that the decision to use property-tax records to identify landowners was based on economic considerations. Our review of the record does not reveal evidence that BRRWD employees considered policy objectives with respect to landowner identification. Instead, BRRWD carried out its standard method of identifying landowners without consideration of alternatives. The BRRWD employee who identified landowners for the project stated in her deposition that the tax record search she used on this project was "generally how we start verifying land ownership." And when asked about alternative methods of identifying landowners, like reviewing deeds from the county recorder's office, she said that "wasn't

something that I had thought about or something that we had done before." BRRWD again does not provide any evidence from the record of a policy consideration tied to this precise conduct. We therefore conclude that BRRWD's landowner identification was an operational decision.

Because we conclude that BRRWD's conduct at issue was operational in nature, we affirm the district court's denial of statutory immunity to BRRWD.[10]

**II**

We next turn to SWCD's arguments. SWCD argues that the district court improperly denied its common-law-official-immunity defense as to the fraud-in-the-inducement claim stemming from Richard and Audrey's meeting with the SWCD manager. SWCD acknowledges that there is a dispute about what took place in that meeting, but it argues that, even construing facts in favor of the Terfehr parties, it is entitled to vicarious official immunity.

The doctrine of common-law official immunity provides that a public official cannot be held personally liable for damages from carrying out "duties which call for the exercise of [their] judgment or discretion." *Elwood v. County of Rice*, 423 N.W.2d 671, 677 (Minn. 1988) (quotation omitted). If common-law official immunity applies to a public official's conduct, the official's government employer generally will be vicariously immune from

---

[10] BRRWD argued in the alternative that disputes of material fact relevant to immunity should have precluded the district court's ruling on the issue. We disagree. The district court determined that many facts relevant to the trespass claim are disputed, including whether BRRWD had permission to enter the Terfehr parties' properties, but those disputes of fact are not material to the immunity issue. The material facts relating to BRRWD's conduct relevant to immunity, as discussed above, are not disputed.

16

suit as well. *Schroeder v. St. Louis County*, 708 N.W.2d 497, 508 (Minn. 2006). But common-law official immunity applies only to an official's "discretionary" duties—it does not offer protection when officials perform "ministerial" duties when "independent action is neither required nor desired." *Anderson v. Anoka Hennepin Indep. Sch. Dist. 11*, 678 N.W.2d 651, 655 (Minn. 2004) (quotation omitted). Even if conduct is discretionary, an official may not be protected by common-law official immunity if the conduct was "a willful or malicious wrong." *Elwood*, 423 N.W.2d at 679.

To determine whether an act is ministerial or discretionary, we focus "on the nature of the act at issue." *Anderson*, 678 N.W.2d at 656. "A discretionary act requires the exercise of individual judgment." *Kari v. City of Maplewood*, 582 N.W.2d 921, 923 (Minn. 1998). A ministerial duty, meanwhile, is "absolute, certain, and imperative, involving merely the execution of a specific duty arising from fixed and designated facts." *Johnson*, 553 N.W.2d at 46 (quoting *Cook v. Trovatten*, 274 N.W. 165, 167 (Minn. 1937)). Like statutory immunity, our inquiry into common-law official immunity begins with determining the precise conduct at issue. *Anderson*, 678 N.W.2d at 656. It is undisputed that the conduct at issue was the SWCD manager's actions and representations during the meeting with Richard and Audrey. The parties dispute what happened at the meeting, but those disputes are not material to the issue of common-law official immunity because, under either representation, we conclude he was engaged in ministerial duties.

The SWCD manager stated in his deposition that he had no role in preparing easement agreements or planning the project—he merely acted as a notary and relayed general information about the project to landowners. His role thus arose from fixed and

17

designated facts and involved the execution of a specific duty. *See Johnson*, 553 N.W.2d at 46. Even if the manager provided incorrect information about the scope of the project, as Richard and Audrey claim, he was still performing the same fixed and specific duties of facilitating the signing of easements and relaying information about the project to landowners. There is no evidence in the record that the manager was tasked with carrying out a discretionary duty on behalf of SWCD.

SWCD's counterarguments are not persuasive. SWCD cites our nonprecedential decision in *Nichols v. State* to support that the manager's duties were discretionary. No. A15-2080, 2016 WL 4421321 (Minn. App. Aug. 22, 2016), *rev. denied* (Minn. Nov. 15, 2016). In *Nichols*, a state officer was granted common-law official immunity as a defense against a former employee's claim of fraudulent inducement based on misrepresentations made to her about her job position before she was hired. *Id.* at *1. We do not view *Nichols* as analogous here because the public official's conduct in that case, consisting of representations made during the hiring process to a potential candidate, required more independent judgment and discretion than the representations the SWCD manager was tasked with making in his role. *Id.* at *1, *3. Further, we do not find *Nichols* persuasive in helping us determine which kinds of tasks are discretionary and which are ministerial because the parties in *Nichols* agreed that the conduct at issue was discretionary. *Id.* at *3. The case, therefore, includes no analysis on the issue presented here. *Id.*

SWCD also argues that a manager who acts within the scope of his managerial duties should be protected by official immunity. This argument does not accurately reflect the test for official immunity. Official immunity does not turn on the official's title or

18

whether they acted in the scope of their employment—it turns on whether the "nature of the act at issue" was discretionary or ministerial. *Anderson*, 678 N.W.2d at 655-56. We are not persuaded that the nature of the acts alleged here—meeting with landowners like Richard and Audrey to answer questions about the project and facilitate the signing of easements—was discretionary.[11]

For these reasons, we conclude that the district court did not err in denying summary judgment to SWCD on the issue of common-law official immunity.[12]

**III**

We last turn to Ehlert Excavating's argument that it is entitled to common-law official immunity because it carried out and implemented BRRWD's policymaking decisions. We are not persuaded.

---

[11] SWCD argues that the district court erroneously found that the manager acted outside of his scope of authority and relied on that finding in determining that immunity did not apply. We disagree that the district court engaged in fact-finding. Rather, the district court noted that SWCD had made somewhat contradictory assertions about the manager's conduct and duties. SWCD insisted that the manager had minimal duties with respect to the project— providing office space and notary services. At the same time, SWCD assumed for purposes of summary judgment that Richard and Audrey's allegations were true—that the manager made certain assurances and promises to them about the project. The district court reasoned that SWCD was not entitled to immunity, however you look at the facts, because he either acted within his duties and performed ministerial tasks associated with providing office space and notary services, or he acted outside of those duties by making assurances and promises to Richard and Audrey. We discern no error in the district court's order on this point.

[12] SWCD also argues that the district court applied a rule 12.02(e) motion-to-dismiss standard instead of a summary-judgment standard when it determined that there was still a dispute of material fact about the willfulness of the manager's conduct. This was an alternative holding by the district court that we do not reach because of our conclusion that the manager's conduct was ministerial and SWCD is not entitled to vicarious common-law official immunity.

As an independent contractor, and not a public official, Ehlert Excavating relies on caselaw establishing that, in some circumstances, an independent contractor may benefit from immunity that is otherwise reserved for public officials. In *Kariniemi v. City of Rockford*, a city government hired an engineering firm to act as the city engineer for a construction project. 882 N.W.2d 593, 596 (Minn. 2016). The Minnesota Supreme Court held that the engineering firm performed services "essential to the proper functioning of municipal government," and acted as the "'City Engineer' on the City's behalf." *Id.* at 601-02. Based on the firm's close relationship with the city and the functions the firm performed, the supreme court concluded that the firm "operated as an extension of the City government, rather than as an independent commercial actor." *Id.* at 602. As such, it was entitled to common-law official immunity as if it were a public official. *Id.* at 601-03.

Ehlert Excavating argues that its work under BRRWD is analogous to the work performed by the engineering firm in *Kariniemi* because Ehlert Excavating performed work for the public's benefit at BRRWD's direction and collaborated throughout the project with BRRWD. But Ehlert Excavating has not shown that it has a special relationship with BRRWD like the relationship between the city and the engineering firm in *Kariniemi*. The record supports that Ehlert Excavating performed construction work on the Whiskey Creek project based on plans already developed by BRRWD and Houston Engineering. Ehlert Excavating states in its brief that it had "absolutely no involvement in planning or designing specifications for the Project" and much of the planning work was already determined before Ehlert Excavating submitted its bid. Based on Ehlert Excavating's own admissions, it performed its work as a typical construction contractor—

20

not as a unique extension of governmental functioning as shown in *Kariniemi*. We decline to stretch the narrow holding of *Kariniemi* to apply to this set of facts.

Even if Ehlert Excavating could articulate a special relationship with BRRWD, its conduct—entering the Terfehr parties' properties to excavate the creek and remove trees—was ministerial and thus not entitled to immunity. Ehlert Excavating's conduct here resembles that at issue in *Williamson v. Cain*, in which the Minnesota Supreme Court concluded that demolition of a building was ministerial. 245 N.W.2d 242, 243-44 (Minn. 1976). The supreme court stated: "Their job was simple and definite—to remove a house. While they undoubtedly had to make certain decisions in doing that job, the nature, quality, and complexity of their decision-making process does not entitle them to immunity from suit." *Id.* at 244. Similarly, Ehlert Excavating had to make some decisions as it carried out the plans for the Whiskey Creek project, but the overall nature of its work was to perform a set of fixed tasks predetermined by BRRWD. Our caselaw does not support extending immunity to such work.

In sum, we determine that Ehlert Excavating did not articulate a special relationship with BRRWD under *Kariniemi*, nor did it show that it engaged in discretionary tasks. We therefore conclude that the district court did not err in its determination that Ehlert Excavating is not entitled to an immunity defense.

Before concluding, we note that Ehlert Excavating also argues that this court should reverse the district court's decision to grant the Terfehr parties leave to amend their complaint to add a claim for punitive damages. Ehlert Excavating maintains that the bar on imposing punitive damages against municipalities like BRRWD in Minnesota Statutes

21

section 466.04, subdivision 1(b) (2024), should apply or extend to Ehlert Excavating. We decline to consider that aspect of the district court's order on an interlocutory basis because our review is limited to the district court's denial of statutory or common-law official immunity. *See McDonough v. City of Rosemount*, 503 N.W.2d 493, 496 (Minn. App. 1993) (stating that "[a]n order denying summary judgment is . . . generally not appealable, and interlocutory review is not appropriate on issues which do not involve immunity from suit"), *rev. denied* (Minn. Sept. 10, 1993). In its reply brief, Ehlert Excavating invokes Minnesota Rule of Civil Appellate Procedure 103.04, which permits this court to "review any order affecting the order from which the appeal is taken" and allows us to "review any other matter as the interest of justice may require." It also maintains that "punitive damages assertions are clearly intertwined" with Ehlert Excavating's work. But Ehlert Excavating does not make an argument with reference to legal authority about how the decision granting leave to amend is reviewable on these bases. We therefore decline to consider this argument at this time.

**Affirmed.**